EDWARD ROBY

*v.*

CHARLES W. COLEHOUR *et al.*

*Filed at Ottawa November 26, 1890.*

1. FIDUCIARY RELATION—*dealings between the parties—strictness of conduct required.* Where two persons stand in such relation to each other that while it continues confidence is necessarily reposed by one in the other, and the influence which naturally grows out of that confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person availing himself of his position will not be permitted to retain the advantage.

2. The relations to which these principles are applied are numerous, such as those of attorney and client, trustee and *cestui que trust,* principal and agent, partners, and part owners of property. The principle extends to every possible case in which a fiduciary relation exists.

3. ATTORNEY AND CLIENT—*dealings between them—presumption—burden of proof—as to fairness.* Attorneys are not, by their fiduciary position, wholly incapacitated from purchasing from their clients, but the presumption is always against the validity of transactions of that character, and the burden is on the attorney to remove that presumption, by showing affirmatively the most perfect good faith, the absence of undue influence, a fair price, and knowledge, intention and freedom of action on the part of the client, and also that he gave his client full information and disinterested advice.

4. Where an attorney and legal adviser of another, who has bought in his client's land on a sale under execution, obtains a quitclaim deed from the client for a consideration much less than the value of the interest conveyed, he insisting at the time that he had acquired the title at the sheriff's sale, and neglecting to advise his client of his rights, such deed will be set aside by a court of equity.

5. SAME—*ratification by the client—of a deed to his attorney.* Before a client will be held to have ratified his deed to his attorney, made under circumstances rendering it voidable, by directing his former tenants to pay rent to the attorney, it must appear that at the time of the alleged ratification the client had been made aware of the nature and extent of his actual rights.

6. PARTNERSHIP—*when it exists—profits in land sales—declaration of trust—its effect in fixing the relations of the parties.* Where the holder of the legal title to land bought and held for speculation by several per-

sons, executed a declaration of trust, providing that the net profits of the enterprise, after the payment of all incumbrances and all moneys advanced by either party, should be shared in by the parties in interest in certain defined proportions, it was *held,* that such declaration did not create an interest in the land in the parties in respect to whom the trust was declared, but that it established the relation of partners in the net profits of the venture.

7. Same—*good faith as between partners.* In cases of partnership, which usually involve also the relations of joint ownership, trust and agency, the utmost good faith is due from each member of the firm toward every other member; and if any dispute arises between partners touching any transaction by which one seeks to benefit himself at the expense of his co-partners, he will be required to show, not only that he has the law on his side, but that his conduct will bear to be tried by the highest standard of honor.

8. Same—*buying in outstanding title by one partner—inuring to the firm.* If one partner buys in an outstanding adverse title to property belonging to the firm, or acquires an interest in the property, without his co-partner's assent, which would be beneficial to the firm, the purchase will be deemed for the firm, and such a purchase will inure to the benefit of the firm, upon contribution made to reimburse the partner making the purchase.

9. Same—*buying co-partner's interest at execution sale.* Where a partner in the profits of land held in trust by a co-partner, and the confidential legal adviser and attorney of the firm, buys in the title of such co-partner at execution sale, he will hold the title thus acquired in trust for himself and the other partners.

10. Trust—*Statute of Frauds.* Trusts arising by construction of law are not within the Statute of Frauds. When the trust grows out of the rule of law which forbids a trustee or other person occupying a fiduciary relation from gaining any personal advantage touching the subject as to which such relation exists, it is a constructive one, and is expressly exempted from the Statute of Frauds.

11. Laches—*enforcing trust.* A bill by one partner to have a purchase of land by a co-partner declared to be in trust for the firm, will be in time if filed shortly after notice that the defendant partner claims such purchase adversely to the firm. Until actual notice of such claim there is no *laches* in suing.

Writ of Error to the Circuit Court of Cook county; the Hon. Murray F. Tuley, Judge, presiding.

On the 7th day of January, 1890, Edward Roby filed in the Circuit Court of Cook county three bills in chancery, one against Charles W. Colehour and James E. Clarke, one against Charles W. Colehour and Jared Myers Clarke, and one against Charles W. Colehour, to compel a conveyance to the complainant of certain portions of the south half and a part of the north-east quarter of section 8, and the north three-quarters of the east fractional half of section 17, in township 37, of range 15, in the county of Cook, containing 406 acres of land. While these bills were pending, Charles W. Colehour, on the 15th day of April, 1890, filed in the same court an original bill against Edward Roby and William H. Colehour, with which the three pending bills were afterwards consolidated, and upon which the principal controversies in the case arise.

Said bill alleges, in substance, that in the year 1871, Charles W. Colehour was engaged in the real estate business in Chicago, his brother William H. Colehour being interested with him in some portions of said business; that in the early part of the summer of that year Charles W. Colehour entered into a negotiation with Henry E. Clarke, representing his brothers and sisters who were then the owners of the above mentioned 406 acres of land, for the purchase of the same, and that said negotiation resulted in a conveyance of said land by said Clarkes to William H. Colehour, by warranty deed dated July 18, 1871, in consideration of the sum of $100,000, of which $10,000 was paid in cash, and after the assumption by William H. Colehour of a mortgage on said land to Mary P. M. Palmer for $4000, the sum of $86,000, the residue of the purchase money, was secured by five promissory notes executed by William H. Colehour, payable in one, two, three, four and five years, with interest at the rate of seven per cent per annum, payable semi-annually, and by a deed of trust on said land to V. C. Turner as trustee, said deed of trust containing a power of sale in case of default in the payment of said notes or any part thereof at maturity; that at the time of said purchase

William Hansbrough furnished $5000 of the money to make the cash payment, and that Francis Corby, Wesley Morrill and Charles W. Colehour furnished the residue in equal proportions, and that it was then and there agreed between Corby, Morrill, Hansbrough and the Colehours, that William H. Colehour should hold the title to said land, one-half for Hansbrough and one-sixth each for Corby, Morrill and Charles W. Colehour, their interests to be in the profits resulting from the sale of said land but not in the land itself; that shortly after the Great Fire of October, 1871, Corby and Morrill surrendered all their interest in said land, and by a proper instrument in writing, conveyed the same to Charles W. Colehour; that on the 16th day of August, 1873, William H. Colehour bought the interest of Hansbrough for $15,066.47, and secured the payment of said consideration by deed of trust, running to Levi D. Boone, upon said north three-fourths of the east fractional half of said section 17.

The bill further alleges that, owing to the stringency of money in the years 1872 and 1873, and the inability of the owners of said land to sell and convert the same into money, said owners were unable to pay the interest maturing on said notes, and that thereupon said Turner advertised said land for sale under the deed of trust to him; that shortly after said advertisement, said Roby, who had previously acted as attorney for the Clarkes, came to Charles W. Colehour and proposed to him to act as the attorney for him and William H. Colehour in protecting said land from sale under said deed of trust, and to take care of and protect said land against any foreclosure proceedings that might be instituted by either the Clarkes or Turner, and offered to act as the attorney for the Colehours in that manner until the entire indebtedness against said land should be paid or removed, for one-fourth of what might be saved on the final sale of said land, after the payment of all debts, taxes and advances made on account of the same; that the Colehours assented to said proposition; that said arrange-

ment with Roby was made pending the negotiations for the purchase of the Hansbrough interest, and was finally consummated after said purchase; that at the time said arrangement was made, it was agreed that Charles W. Colehour should have the sole management and sale of said land, and that Roby should attend to all legal matters in relation to the same, and that Charles W. Colehour should receive, for managing said property, the sum of $5000 per year, and that upon the final sale of said property, after all advances made for the payment of the debts, taxes, incumbrances and liens against the same were paid, the net proceeds should be divided, one-half to Charles W. Colehour, one-fourth to William H. Colehour, and one-fourth to Roby; that on the 29th day of May, 1873, and before said arrangement with Roby was made, William H. Colehour executed under his hand and seal, acknowledged and delivered to Charles W. Colehour a warrant of attorney, authorizing him, as the attorney in fact of said William H. Colehour, and in his name, place and stead, to take possession and sole and absolute control and charge of said land, and plat and subdivide the same, sell and convey it by lots and blocks, receive the proceeds, borrow money, pay taxes, debts and incumbrances, prosecute, defend, dismiss, settle or compromise suits, employ an attorney, and generally, to have entire and exclusive charge of said lands and all business connected therewith, until the Palmer mortgage and the Turner deed of trust should be fully paid; that it was provided in said warrant of attorney that said Charles W. Colehour should be paid for his services, out of the proceeds of said lands, the sum of $5000 per year, and said warrant of attorney was declared to be continuous and irrevocable until said land should be free and clear, and said attorney should be paid in full all sums of money advanced by him and his salary.

It is further alleged that at the time said arrangement with Roby was made, said warrant of attorney was shown him as being then in full force and effect, and that he consented to

and approved it, and took his interest subject thereto; that on the 16th day of August, 1873, in order that the rights of the parties in said land might be fixed and determined, the following declaration of trust was made and executed by William H. Colehour and delivered to said Charles W. Colehour, to be kept for the benefit of the parties interested in said land, to-wit:

"*Know all men by these presents,* that I, William H. Colehour, a bachelor, being the owner in fee simple of the land in the south half of section eight (8), and the north three-quarters of east half of section seventeen (17), all in town thirty-seven (37), N., R. fifteen (15), east of the third P. M., Cook county, Illinois, more particularly described in deed dated July 18, 1871, made by Robert D., Henry, Sarah J. and Harriet S. Clarke, to me, which land is subject to an incumbrance of $86,000 to said Clarkes and $4000 to Mary Palmer, and other sums due on account of said lands, do hereby declare that Charles W. Colehour shall be entitled to the one-half of said land, or the profits to be realized out of it after the above debts are fully paid and all other necessary sums of money hereafter required shall be fully paid, and Edward Roby shall be entitled to the one-quarter of land, or profits thereof, when all debts against said land hereafter have been fully paid.

"I reserve the right to handle the land as I please, without interference from Charles W. Colehour and Edward Roby. And should either of them seek to acquire any interest in the lands before it is fully paid for, he shall forfeit the interest he is above to be entitled to by the terms of this declaration. The power of attorney heretofore given to Charles W. Colehour shall remain in full force.

"The sole consideration for the interest of said Roby, as above named, grows out of his services as attorney to be rendered me as I require the same, until the land is fully cleared of all debts of every nature.

20—135 ILL.

"The terms of this trust can not be changed. Charles W. Colehour shall be my successor in this trust; after him, Edward Roby shall be trustee, if Charles W. Colehour shall give up the trust. I reserve the right to act as trustee, however, during my pleasure.

"In witness hereof I have hereunto set my hand and seal, this 16th day of August, 1873.

WILLIAM H. COLEHOUR.    [Seal.]

"I have this day, August 16, 1873, given to Hansbrough, for his interest in said lands, my notes for \$15,066.47, and taken up my contract with him."

. Attached to said declaration of trust is a certificate of the acknowledgment thereof by William H. Colehour before a notary public, dated August 13, 1875, and endorsed thereon is a certificate showing that said instrument was recorded July 14, 1888.

The bill further alleges that said declaration of trust was assented to and accepted by said Roby, and that from that time Charles W. Colehour, the complainant, has acted under said instrument and accepted the same as the sole agreement by which the interests of the parties in said land are defined; that in December, 1873, the complainant caused the south half of said section 8 to be subdivided and platted into blocks and lots, said lots being about 2000 in number, and that during that year and the year following, he made a large amount of improvements thereon, by throwing up and grading streets, digging drains, laying sidewalks and building bridges, and devoted his entire time to the improvement of said property and the sale of lots in said subdivision; that from the spring of 1872 to the year 1879, he had the sole charge of said land and the improvements thereon, and since the last mentioned date has had possession of said land, except the lots conveyed to actual purchasers, and fenced the unsold portions, and expended out of his own pocket large sums of money thereon;

that from 1873 to 1878, inclusive, Roby was daily cognizant of what was being done, and from week to week and from day to day knew the amount of money received from the sale of lots and what was done with it; that a large amount was expended in improvements, all of which were known to and approved by Roby; that the complainant never received from the sales of lots for his personal use more than $1500 per year and some years not that; that prior to 1878 the complainant had an arrangement with the Clarkes by which lots were released from the lien of the Turner deed of trust as they were sold, upon the payment to them of a certain sum upon each lot released, but that sometime during the year 1878 said Clarkes refused to grant any further releases, which prevented any further sales of lots.

That in October, 1881, said Clarkes filed a bill in chancery in the Circuit Court of Cook county to foreclose the Turner deed of trust; that Roby, at the time said arrangement was made with him for a one-quarter interest in the net profits from said land, assured the complainant and William H. Colehour that he knew certain facts which would prevent the foreclosure of said deed of trust, and that when said bill was filed he again assured the complainant that he could defeat said foreclosure suit; that about that time, as the complainant is informed and believes, Roby conceived the idea of taking advantage of the confidential position he held as attorney and confidential friend of the Colehours to get control of said property and to cheat and defraud them out of their rights therein, although for a long time thereafter he pretended to act with them and for their interest; that in September, 1878, a judgment for $4113.58 and costs was recovered against the Colehours in the Superior Court of Cook county in favor of O. H. Horton, receiver of the German National Bank, the debt for which said judgment was recovered having been contracted to raise money to pay, and which was paid, upon the Clarke indebtedness, as was well known to Roby; that an execution was

subsequently issued on said judgment under which a large number of the lots and blocks in said subdivision were levied upon and sold, one Landis becoming the purchaser, and that a sheriff's deed therefor was issued to said Landis November 1, 1883; that Roby, at the time, had in his possession notes belonging to the Colehours amounting to $20,000, and represented to them that he could buy said Landis' title to said lots very cheap, as they were subject to the lien of the Turner deed of trust, and proposed to trade for the same as best he could, saying that he could do better probably in buying in said title than could the Colehours, and that he would hold the title in trust for all three under the same trust that it had formerly been held by William H. Colehour; that Roby did buy up said Landis' title on the 16th day of June, 1884, the consideration expressed in the deed being $600, but the fact being, as the complainant alleges, that he only paid about $200, and that he now claims to be the absolute owner of said lands as against the Colehours.

That at the June term, 1878, of the Superior Court of Cook county, a judgment was recovered against the complainant, in favor of Charles B. McCoy, for the use of Frank W. Harding, for $3700 and costs, and that on the 23d day of May, 1885, other portions of said land were sold under execution issued on said judgment for the sum of $500, George F. Harding being the purchaser, and that a sheriff's deed for the same was subsequently issued to him; that Roby informed the Colehours that he had got Harding to buy in said lots and to hold the same for the benefit of the Colehours and himself, to be conveyed when said debt to Frank W. Harding should be paid; that afterward, and during the year 1888, Frank W. Harding was fully paid out of moneys received from a sale of a portion of the trust property, with the knowledge, consent and in the presence of said Roby; that on the 8th day of February, 1888, George F. Harding, at the request of Roby,

deeded said lots and lands to him, and that Roby now claims to own the same absolutely, as against the Colehours.

That on the 24th day of September, 1879, the Crane Bros. Manufacturing Company recovered a judgment against the Colehours in the Superior Court of Cook county for $3591, and that afterwards an execution on said judgment was levied upon a large amount of the remaining lots and lands belonging to said trust property, and was sold by the sheriff on the 14th day of September, 1886, said Roby becoming the purchaser; that prior to said sale Roby, at the complainant's request, bought said judgment for $750, of which the complainant paid $250; that it was then agreed between the complainant and Roby that Roby should hold said judgment for the benefit of the trustee of said land, and that if a sale should be made, Roby should purchase said land and hold the same as trustee, in the manner provided in said declaration of trust of August 16, 1873, but that he now claims to hold the same for his own use and benefit, and denies that the Colehours have any interest therein.

The bill further alleges that, on or about the 1st day of May, 1879, Roby was dissatisfied with William H. Colehour and unwilling that he should act as trustee, and suggested that as the whole management of the property was in the hands of the complainant, he ought to act as trustee, and that in compliance with that suggestion, William H. Colehour executed and delivered to the complainant a deed conveying to him the legal title to said land; that Roby advised that it better not be recorded at the time, and that the complainant held said deed and neglected to put it on record until July 14, 1888, when he had it recorded, but that Roby well knew of its execution and approved of it, and that from the date of its delivery the complainant acted as trustee in place of William H. Colehour, and that as such trustee he took possession of said land, fenced the portions not sold, and has held possession thereof ever since; that on or about the 1st day of Janu-

ary, 1887, Roby, with intent to defraud the Colehours out of
their just rights in said land, went to one Lender, who was a
friend both of himself and of William H. Colehour, and who
had been connected with said property as agent from the time
it was subdivided and was familiar with its history, and rep-
resented to him that he, Roby, had, by sales on judgments,
got control of and had become the owner of all the complain-
ant's rights in said land; that the attorney for the complain-
ant in the Clarke foreclosure suit would have nothing to do
with the complainant; that it was absolutely necessary that
all the interests in said land adverse to a foreclosure should
be got under one control, and that if he could get that, he
could settle with said attorney and close up said litigation;
that he would protect the rights of every one owning any in-
terest in said land, and he asked said Lender to see William
H. Colehour and induce him to deed his interest in said land
to Roby without the complainant's knowledge; that Lender,
believing said Roby and believing that it would be for the
interest of all concerned that said matters should be settled,
went to William H. Colehour and told him what Roby had
said and induced him to meet Roby; that at said meeting
Roby told William H. Colehour in substance what he had told
Lender; that William H. Colehour told Roby that he would
do nothing to interfere with the complainant's rights; that
Roby then told him that the complainant's rights would be
protected, and that he should have what he was entitled to;
that the only way to get anything out of the land was to get
the entire title in Roby; that he could then settle the fore-
closure suit, but that unless that was done, everything would
be lost; that William H. Colehour seemed reluctant to make
a deed to Roby, and that Roby then told him that he could
get nothing in any other way; that he, Roby, held entire con-
trol of the house in which Colehour lived, and that if he did
not do as he, Roby, wished, he would put him out into the
street in three days; that Lender, believing that Roby told

the truth, and that it was for the best interest of Colehour to do as Roby requested, strongly urged Colehour to convey his title to Roby, and Colehour, believing Roby and Lender, and being then unfriendly to the complainant, made such conveyance without the complainant's knowledge; that Roby then produced a deed which was finely written and read it to Colehour and that Colehour, believing it was read correctly, signed and acknowledged it and caused his wife to sign and acknowledge it, and delivered it to Roby secretly and without the knowledge of the complainant; that said representations of said Roby were false; that he had not then by sales under judgments got control of and that he did not own the complainant's interest in said land, but on the contrary, held whatever title he had so acquired in trust for the complainant and William H. Colehour; that it was not true that the attorney for the Clarkes in the foreclosure proceeding would have nothing to do with the complainant, or that Roby, if he could get control of all the interests in said land, would settle with said attorney; that Roby did not hold the legal title to the house and lot where William H. Colehour lived, and Roby, instead of protecting the complainant's rights, was deliberately attempting to cheat him out of the same; that the deed executed by William H. Colehour, instead of only conveying the one-quarter interest of said Colehour, in fact conveyed also the interest of the complainant.

It is further alleged that after the Clarkes refused to give further releases of lots sold, Roby, William H. Colehour and the complainant got together and carefully examined all books and accounts showing sales of lots and disbursements of money received therefrom; that Roby then had in hand notes and securities belonging to said trust amounting to at least $15,000, and that it was then agreed between the three, that matters between them should be considered square, and that neither owed the others anything, and that Roby should hold, collect and account for said securities; that since that time the com-

plainant has paid out and expended in caring for and protect-
ing said property more than twice as much as Roby paid in
purchase of said judgments or of the lots sold thereunder, and
that Roby has rendered no account of the notes and securities
held by him.

That in 1886, Roby, acting as the attorney for said Cole-
hours, advised the commencement of a suit in forcible detainer
against one John Thurman who was in the occupancy of a
part of said land, to recover possession of the same; that a writ
of restitution was issued in said suit and delivered to a con-
stable to execute, but that in the execution of said writ, said
constable committed a certain irregularity for which the wife
of said Thurman brought suit in the Superior Court of Cook
county against said constable and said Colehours and recov-
ered therein a judgment for $1500 and costs, which is now a
lien on the interests of said Colehours in said land; that at
the time said judgment was recovered, said Roby agreed that,
as said judgment had resulted from an attempt to recover
possession of said land upon his advice and for the benefit of
all interested therein, he would pay one-fourth of the same.

The bill alleges that from the date of said arrangement with
Roby the complainant has in all respects and to the best of
his ability endeavored to carry out and promote the best in-
terests of the equitable owners of said land, but that said Roby,
taking advantage of the complainant's financial position and
of his confidential relations with the complainant as his attor-
ney, misled him and induced him to consent to said execution
sales, the complainant believing that said Roby would, in good
faith, carry out his promises and agreements; that said Roby
has not carried out his said agreements, but in violation of his
duty as one jointly interested with said Colehours in said land,
has deliberately and intentionally attempted to deprive them
of their rights in said land; that from 1873 to the latter part
of 1889, complainant believed that Roby was working with
him in good faith to carry out the original intentions of said

parties to defend said foreclosure suit and protect the equity of redemption in said land and sell and dispose of the same to the best advantage and divide the net proceeds as provided in said declaration of trust, but that said Roby now claims that neither the complainant nor William H. Colehour has any right, title or interest in said land, and claims the same as his own, subject only to the amount due to said Clarkes, and has filed his three bills in chancery to compel the complainant and two other parties who held the legal title to portions of said land for the benefit of the equitable owners thereof, to deed said portions of said land to him; that in fact said two parties have deeded to the complainant the titles they held to said land and that he now holds the same subject to the order of the court.

It is further alleged that a portion of said land was sold in pursuance of the decree in said foreclosure suit on the 30th day of December, 1889, and the residue on the 29th day of January, 1890; that said lots were sold separately and the unsubdivided land in tracts, and that none of said lots or tracts sold for one-half of what they could be sold for by a receiver appointed by the court; that the condition of the title is such that the equity of redemption can not be sold for one-tenth of its real value if at all; that if a good title to said property could be furnished, it could readily be sold for from $200,000 to $250,000 over and above the amount due on the Clarke deed of trust; that if a receiver should be appointed and Roby, the complainant and William H. Colehour required to convey their titles to such receiver, he could, by redemption from said sale, give a perfect title, and if directed to sell the same and hold the avails to abide the decree of the court, a large amount could be realized; that neither Roby nor the Colehours have the means to redeem from said sale, and that no purchaser can be found who will be willing to take the title as it now stands and pay anything like an adequate consideration.

The bill prays that said deed from William H. Colehour to Roby be held and declared null and void and of no effect, and set aside as a cloud upon the title of William H. Colehour; that a receiver be appointed and Roby, William H. Colehour and the complainant be ordered to convey to such receiver the titles to said land or any part thereof held or controlled by them or either of them; that said receiver be ordered to sell the same and hold the proceeds subject to the final decree in the cause; that the complainant and William H. Colehour be decreed to be the owners of the equity of redemption in said land; and also a general prayer for relief.

William H. Colehour answered said bill admitting its material allegations, and afterward filed his cross-bill setting up substantially the same matters alleged in the original bill of Charles W. Colehour, and praying in his own behalf substantially the same relief.

Roby answered the bill and cross-bill, admitting the purchase of said land from the Clarkes and the conveyance of the same to William H. Colehour substantially as alleged, Hansbrough furnishing $5000 of the money used in making the cash payment and receiving from William H. Colehour a declaration of trust entitling him to one-half of the profits when the land was sold, but alleging that the other $5000 was furnished by Morrill alone, and that William H. Colehour executed to Morrill, Corby and Charles W. Colehour a declaration of trust entitling them jointly to one-half of the net profits which should accrue from the sale of the land; that about the 1st day of May, 1872, Morrill and Corby, in consideration of an agreement by William H. Colehour not to call upon them to pay any part of the unpaid balance of the purchase money, and of Charles W. Colehour's note to Morrill for one-third of said sum of $5000 advanced by him, it was agreed between Morrill, Corby and Charles W. Colehour that said declaration of trust to them should be destroyed, it never having been recorded, and that the interests of Morrill and Corby secured to

them by said declaration of trust should be transferred to Colehour, but that said note to Morrill has never been paid by Colehour.

The answer alleges that Hansbrough paid, in interest on the Palmer mortgage and the Turner deed of trust the sum of $6125.35, but the interest and a part of the principal of the deed of trust being in arrears, Turner, the trustee, in the latter part of the summer of 1873, advertised said land for sale; that Roby was employed by the Clarkes to prepare and publish the notice of sale, that being the only matter in which he acted as their attorney; that the Colehours at that time were represented by another attorney, who informed the said trustee that if a sale should be made the title would be uncertain, owing to the fact that the place where the sale was to be made had been destroyed by fire, and that said trustee, after being advised, concluded to abandon the sale, provided the Colehours would pay Roby's fees and the cost of publishing the notice, which they agreed to do, and the sale was thereupon abandoned; that Roby did not, after the advertisement and before the day fixed for the sale, go to the Colehours and propose to act as their attorney in protecting said land from sale under the deed of trust or from foreclosure, and that he had no conversation with them in any manner suggesting such arrangement.

The answer denies that there was any agreement at any time that Charles W. Colehour should have the sole management, charge and sale of said property, or that Roby should attend to the legal matters in relation to the same, or that Charles W. Colehour should receive $5000 per year, or any other sum, for managing the property. It denies all knowledge on the part of Roby of the execution by William H. Colehour to Charles W. Colehour of the warrant of attorney of May 29, 1873, or that any such paper was ever shown him or that he ever consented to any such arrangement. It also denies that there was any arrangement in relation to said land

between Roby and the Colehours on the 16th day of August, 1873, or that Roby ever saw the declaration of trust of that date, or heard of its existence prior to the year 1889, or that he ever assented to any such instrument or arrangement.

The answer alleges that Hansbrough, on the 16th day of August, 1873, entered into a contract with certain parties for the sale of his interest in said land, but the purchaser failing to carry the contract out, Hansbrough subsequently employed Roby to sell it for him, agreeing to give him a commission of $1000 if he would sell it for $20,466.87; that Hansbrough proposed a sale to Charles W. Colehour, and that Roby should take an interest with him in the purchase, and offered to accept in part payment Roby's note for $5400, less the amount of said commission; that Colehour said he had no money, but it was finally agreed between Hansbrough, Colehour and Roby, that Hansbrough should sell his interest for $20,466.87, of which $1000 should go to Roby for his commission, and that for the residue he should take Roby's note for $4400, and the note of William H. Colehour for $15,066.87 secured by a deed of trust upon the north three-quarters of the east fractional half of said section 17, both notes to be dated back to August 16, 1873, and to bear interest from that date, and that the sale was consummated on those terms; that said Charles W. Colehour thereupon, in the presence of William H. Colehour and Roby, on the 18th day of October, 1873, the day on which said sale was consummated, wrote upon the declaration of trust in favor of Hansbrough an assignment by him, in which it was expressed that, in consideration of $15,066.47 in hand paid by Charles W. Colehour and $4400 by Roby, he assigned, sold and transferred all interest in said instrument to said Colehour and Roby, which assignment was dated October 18, 1873, and executed by Hansbrough under seal.

It further alleges that, in consideration of the fact that Roby had furnished a part of the consideration for said purchase as above stated, it was insisted by him that he should have an

undivided one-half of said undivided one-half interest in said land, and that Charles W. Colehour wrote out with his own hand, and said William H. Colehour signed, sealed and delivered to said Roby the following instrument:

"I, William H. Colehour, being the owner in fee of the south half of section 8, and part of the north-east quarter of same, and of the north-east three-quarters of section 17, all in T. 37, N., R. 15 E., third P. M., Cook county, as conveyed me by deed of Henry F., Robert D., Harriet S. and Sarah J. Clarke, dated July 18, 1871, and recorded August 2, 1871, in Cook county, Ill., do hereby acknowledge that after the payment of all sums of money due on any notes of mine secured upon said land, the payment of all interest payable on account of said notes, the payment of all moneys advanced on account of any development of said land, or on account of any industry on or beneficial to said land, and the payment of all sums of money advanced by C. W. Colehour and Edward Roby, or hereafter to be advanced on account of anything pertaining to said land, then Edward Roby shall be entitled to the one-fourth part of the net profits of said land, Charles W. Colehour shall be entitled to the one-half of the net profits of said land, and I shall be entitled to the one-fourth part of the net profits of said land. This shall apply to the heirs, executors or administrators of any and all of the parties above mentioned, but no assignment of any interest shall be made without the written consent of all the parties hereto first obtained. And this division of interest is in consideration of money advanced by the above mentioned Roby and C. W. Colehour on behalf of said land, and subject to any agreement of mine with reference to said land, heretofore made by me, concerning any division into lots, conveyances, management thereof, or of any indebtedness incurred in behalf of said land.

"And I hereby make, constitute and appoint Charles W. Colehour my true and lawful attorney in fact, to sell said lands by lot or block, as he may deem best, and to give deeds for the

same, with proper notes back for deferred payments, and to do this, shall have full power to sign my name to any deed or instrument, and acknowledge the same, in as full a manner as I could do myself, with Edward Roby as his substitute; and I do hereby confirm all acts done by my attorney in fact, and also his substitute in this behalf, as my acts, and as binding on me or my heirs, executors or administrators.

WILLIAM H. COLEHOUR. (Seal.)"

The answer alleges that Roby afterwards paid said note given by him to Hansbrough, but that the note given by William H. Colehour nor any part of it was ever paid by the Colehours. It denies that Charles W. Colehour caused any portion of said land to be platted and subdivided, or made any improvements thereon, but that said subdivision was made by William H. Colehour, in conjunction with the owner of an adjoining tract of land, and that whatever streets were graded, ditches dug or sidewalks built, were paid for out of the proceeds of the sale of lots, and that the bridges were built by the village of Hyde Park, mainly through the efforts of Roby; that Charles W. Colehour did not have charge of said land from 1872 to 1879, but that the same was in the possession of William H. Colehour, and that whatever was done thereon was done by William H. Colehour, or by Charles W. Colehour as his attorney and agent; that Charles W. Colehour expended no money of his own on said land, but on the contrary took the proceeds of said land in large and small sums and applied the same to his own use; that on the 22d day of September, 1886, Charles W. Colehour, for a valuable and sufficient consideration, sold, conveyed and quit-claimed all his right, title and interest in said land to William H. Colehour, and that he thereafter held no right, title or interest in or claim upon said land or any part of it; that August 30, 1878, he filed in the District Court of the United States for the Northern District of Illinois his petition to be adjudicated a bankrupt, and that he was thereupon so adjudicated, and that his property and

interests of every nature were duly conveyed to his assignee in bankruptcy; that having previously conveyed all his interest in and to said land to William H. Colehour, and having then no interest in said land or any part thereof, or in the proceeds thereof, he did not schedule the same in the bankruptcy proceedings.

The answer admits that prior to 1878, there was an arrangement with the Clarkes for the release of lots from the Turner deed of trust upon payment of a certain sum in cash per lot, and that the Clarkes subsequently refused to grant further releases, and that on the 24th day of October, 1881, the Clarkes filed their bill to foreclose said deed of trust. It denies that Roby assured the Colehours or either of them that he knew facts which would prevent a foreclosure of said deed of trust or that he could defeat such foreclosure.

It further denies that Roby, at any time, conceived any design to take advantage of the Colehours, or that he held any confidential position as attorney or friend of either of them or otherwise, or that he pretended, in said foreclosure suit or otherwise, to act with them or for their interest, but alleges, on the contrary, that Charles W. Colehour was himself a lawyer, and that William C. Goudy acted for and as the attorney and adviser of the Colehours in September, 1873, and from that time until December, 1885, when the Clarke foreclosure suit came on for trial, and that various other attorneys acted for them in various legal proceedings; that Roby did not at any time become their attorney in consideration of one-fourth of the profits of said land; that from 1873 to 1878, he was never their attorney except in a very few cases under special arrangement in each case; that since January, 1878, he has acted for his own interest, and in various litigations in which the Colehours have been involved, he has been the attorney for the parties opposed to them.

The answer alleges the recovery of a judgment for $2265.50 and costs against the Colehours by the Mechanics' National

Bank December 6, 1875, and the sale of some five hundred lots in said subdivision on execution issued thereon, and that Roby had no notice of said proceeding until December 22, 1877, after a sheriff's deed for said lots had been executed and recorded; that on the 31st day of October, 1878, a judgment for $4113.58 and costs was recovered against said Colehours by Horton, receiver, and that Roby had no notice of said suit or judgment until after another portion of said land had been sold under execution on that judgment and a sheriff's deed to Landis had been executed therefor; that Roby had possession of no notes belonging to the Colehours; that he had no conversation with them concerning the Landis title as alleged in the bill, and did not agree to buy it in his own name and hold it in trust for the benefit of the three, but that having first learned of the Landis title about April, 1884, he, without consulting any one, called upon Landis and purchased his title for $600, and paid him that sum of cash out of his, Roby's, money, and received a conveyance of said title in his own right, and in no manner for the benefit of any other person whatsoever.

That on the 2d day of July, 1877, Charles W. Colehour, without Roby's knowledge, fraudulently caused a deed for a large parcel of said land, worth over $30,000, to be made to Jared Myers Clarke, and also in like manner, on the 14th day of January, 1878, caused a deed of a large number of lots in said subdivision to be made to Jacob Bremer, the title to which afterwards became vested in James E. Clarke, and that Roby having soon afterwards discovered said conveyances, charged Colehour with the same, and that thenceforth for eight years his relations with said Colehour were adverse.

It is further alleged that on the 4th day of June, 1878, a judgment for $3700 and costs was recovered against Charles W. Colehour by Charles B. McCoy, and that a portion of said land was sold under execution on that judgment to George F. Harding, and that a deed was issued to him; that said title was not held by Harding for the benefit of the Colehours;

that said title was paid for by Roby with his own money, and was conveyed to him for his own use and benefit, and that the Colehours had no interest therein; that on the 24th day of September, 1879, a judgment for $3591 and costs was re-covered against the Colehours by the Crane Brothers Manufacturing Company, said judgment being for indebtedness of Charles W. Colehour in no way connected with said land; that an execution was issued on said judgment and levied on said land as alleged in the bill, and that said land was sold to said Roby in September, 1886; that Roby bought said judgment from the plaintiff therein for $750 for his own use and paid therefor with his own money, and that there was no agree-ment between him and the Colehours in relation to the same; that the Colehours never furnished Roby with any money or thing of value to buy said judgments or judgment titles, and never in any manner contributed in the slightest degree to the purchase thereof.

The answer denies that the deed of May 1, 1879, from William H. to Charles W. Colehour was executed at the suggestion of Roby, or that he had any notice of such deed until some-time in 1889, or that Charles W. Colehour took possession of said land, but on the contrary alleges that from September 22, 1876, hitherto, said Charles W. Colehour has stated, both orally and in writing, and both in conversations and under oath, that William H. Colehour was in possession of said land down to late in the year 1887, and until after Roby's purchase from William H. Colehour of all his interest in said land; that William H. Colehour, after giving Roby the deed alleged in the bill, turned over to him the possession of said land, and notified the tenants to attorn and pay rent to him, and that Roby entered into possession of said land and held possession thereof during the whole of the years 1888 and 1889, without any objection on the part of Charles W. Colehour, or any claim on his part to the possession, control or charge of the same.

The answer denies the negotiations and misrepresentations leading to said conveyance from William H. Colehour to Roby charged in the bill, and gives Roby's version of the transaction at great length, by alleging facts showing that said conveyance was obtained by Roby in good faith and for an adequate consideration, and without the employment of any misrepresentation or undue influence.

The answer denies a settlement of accounts between the Colehours and Roby after the Clarkes had refused to grant further releases as alleged in the bill, or that the Colehours commenced and prosecuted the forcible detainer suit mentioned in the bill by Roby's advice, or that Roby agreed to pay any part of the judgment obtained by Mrs. Thurman against the Colehours, or that Roby sustained any confidential relations with the Colehours, or had anything to do with them in the matter of the several execution sales above mentioned. It denies that Roby was the attorney of the Colehours in the Clarke foreclosure suit, but on the contrary that he litigated for himself, and that having purchased all the right and interest of William H. Colehour, he, in prosecuting his appeal to the Supreme Court, used the name of said Colehour as he had a right to do.

The answer sets up and relies upon the Statute of Frauds both generally and also specifically as barring any equitable interest of the Colehours or either of them in the titles obtained by Roby through said sheriff's deeds, and all interest claimed by them or either of them through agreements by Roby not evidenced by any written memorandum signed by him; and also charges Charles W. Colehour with laches in the assertion of his alleged equitable interest in the titles obtained by Roby through said sheriff's deeds.

To each of the three bills filed by Roby, Charles W. Colehour filed his answer setting up his rights in the land there in question substantially as set forth in his original bill. James E. Clarke, in the suit against him, answered alleging that he had

conveyed the title held by him to Charles W. Colehour and disclaiming all interest in the subject matter of the bill. Jared Myers Clarke failed to answer the bill against him and was defaulted, but it appears that the land which had been conveyed to him had also been reconveyed to Charles W. Colehour, or to some member of his family and that said Clarke therefore had no interest therein.

Replications were filed, and the cause having been heard on pleadings and proofs, the chancellor, in deciding the case, delivered the following opinion:

TULEY, J.: "From the evidence in this case it appears that in 1871 Henry F. Clarke deeded the land in controversy to William H. Colehour, the consideration being $100,000, of which $10,000 was paid in cash, a small mortgage of $4000 assumed, and purchase money mortgage given for $86,000. William Hansbrough and Wesley Morrill and Francis Corby furnished the cash and were interested in the profits that might result from a resale of the property. The town of Colehour was projected and located in part upon this property, and large profits were expected from the resale of the property. Morrill and Corby in some way surrendered or abandoned their interest—how, is immaterial. Hansbrough assigned a certain paper or declaration of trust, made by W. H. Colehour, the holder of the legal title, to Boone, and that interest,—a one-half interest in the profits,—was conveyed, in 1873, to Charles W. Colehour, the complainant, and the defendant Edward Roby, each taking one-half thereof.

"Charles W. Colehour had been the chief manager in the original purchase, and had been acting under a power of attorney from William H. Colehour, who gave him a salary of $5000 per year. About the time or shortly after the purchase from Hansbrough, a declaration of trust as to the interest of the said Charles W. Colehour, William H. Colehour and Edward Roby was made, and it was, that C. W. Colehour was entitled to one-half, W. H. Colehour one-fourth and Edward

Roby to one-fourth of said land, or the net profits realized therefrom after the payment of the mortgages, costs of development and charges incident to the joint adventure, the intention and effect of the arrangement between the parties being that W. H. Colehour should be the only party liable for the mortgages, etc., and that the net profits should be shared in the proportion named.

"A similar instrument, so far as the recitals go, as to the interests of the parties, was given by W. H. Colehour to Morrill and Corby on the purchase of the land in 1861, and that has received a construction by our Supreme Court in the case of *Morrill* v. *Colehour*, 82 Ill. 618. It was there held, that Morrill and Corby had no interest in the land as such, but that the relation of the parties was that of partners, or of persons who had joined in a joint adventure or speculation, and that their only interest was in the net profits that might be realized. Substantially the same view was taken in regard to this particular declaration of interests in the foreclosure case brought in this court on the $86,000 mortgage, and which was appealed to and affirmed in the Supreme Court. *Boone* v. *Clark*, 129 Ill. 466.

"One of the strongly contested points in this case is as to which is the actual agreement between the parties, — that contained in a declaration of trust dated August 16, 1873, produced by complainant, or that without date, produced by Roby,—both being signed by William H. Colehour, and both being made at or shortly after the purchase from Hansbrough. The two instruments do not differ as to ratio of interests of the three parties, or as to the character of such interests, but the one produced by complainant confirms and keeps in force the power of attorney to C. W. Colehour, heretofore given, while the Roby instrument is silent as to that. The Colehour instrument also recites that the sole consideration for the interest of Roby was for services to be performed. No such provision is found in the Roby copy. There is a clause of for-

feiture of interest if attempt be made to acquire an interest in the land before it is paid for, contained in the Colehour and not in the Roby instrument. Roby's recites as a consideration, money paid by Roby for his interest, and prohibits any assignment by any of the parties of any interest without the written consent of the others. It also appoints Charles W. Colehour attorney in fact to sell and make deeds of the lands. These provisions are not found in the Colehour instrument.

"The evidence, to my mind, shows that the instrument produced by Roby was the one last drawn; that the minds of the parties did not agree upon the other, and therefore the Roby instrument was prepared and signed. I am of the opinion that it was agreed to by all parties, and delivered to Roby as containing the true declarations of the interest of the parties. It must be so treated and held.

"It appears that a quitclaim deed was made September, 1876, by C. W. Colehour to William H. Colehour, of all his interest in the lands. No consent of Roby was given thereto. It also appears that in 1878 C. W. Colehour filed his petition in bankruptcy in the United States court in this district, and did not schedule the said land, or any interest in the same, or the net profits aforesaid. Roby, about the same time, went into bankruptcy, and scheduled his interest, and bought the same back from his assignee for a nominal consideration.

"On May 1, 1879, complainant contends that W. H. Colehour, with the knowledge and assent of all the parties, made a deed of the land, to be held subject to the original trust declaration made in 1873, which deed was not recorded until 1888. Much evidence has been introduced to show that defendant, Roby, advised and insisted on such deed being made, and knew all the facts concerning its execution, upon the theory that if he did, he would be chargeable with notice thereof at the time of the execution of the deed of W. H. Colehour to him of the lands in question, in 1887. In my opinion, it is not material to the rights of complainant that it be shown that Roby advised or

knew of the execution of the deed, or of its existence; but the finding may be made, if deemed by complainant's counsel necessary to insert such in the decree, that the evidence shows such deed was executed and delivered at or prior to the date of the acknowledgment thereto attached, and that Roby knew of the existence of the deed and the claims thereunder before the execution of the deed of W. H. Colehour, made to him in the year 1887.

"It appears that complainant gave very considerable time and attention to selling lots in the subdivision made of the land, and the making of the necessary street improvements, for a number of years,—at least until 1878, when the holders of the Clarke mortgage ceased (as they had before been doing) to release lots that could be sold from the mortgage. In 1880 Charles W. Colehour was absent from the land and from Chicago a large portion of the year, and the same was true of the years 1881 and 1882. In 1881 the Clarkes commenced their foreclosure proceedings, making the Colehours, Roby and other parties in interest, defendants. A decree of sale for over $145,000 was entered, which went to the Supreme Court, and was affirmed. The land was sold, according to the subdivision, by the lot, in the month of December, 1889, and the month of January, 1890.

"Much testimony has been introduced to show that in the foreclosure proceedings, Roby, although not of record the solicitor of the Colehours, was in fact their principal adviser, and in the appeal proceedings through the Appellate and Supreme Courts he was their only adviser and solicitor. Roby alleges that he appeared for himself, the Boone heirs, (who held a second mortgage,) and for certain owners of lots, and other defendants, and that C. W. Colehour was defaulted; that he claimed, in his answer to the foreclosure suit, that the Colehours had defrauded him out of a large amount of money, and he, Roby, was in equity entitled to all proceeds of the sale of the property after the payment of mortgages and liens. He

also denies that he acted, either in or out of court, as the adviser of the Colehours, or either of them, in the foreclosure proceedings or appeals thereon. There was no cross-bill by Roby, nor issues made between Roby and the Colehours.

"I am satisfied, from the evidence, that Roby did advise and consult with the Colehours as to the defense of said foreclosure suit and the appeals thereon. The Colehours and Roby had the same interest in defeating the foreclosure suit, if possible, and if not, in reducing as much as possible the mortgagee's claim. There were many complications in that suit, which was before this branch of the court, and the claimed credits, not admitted by the Clarkes, amounted to many thousands of dollars. Being jointly interested, they made common cause, and there is no doubt they often consulted together, and that Roby gave his advice as an attorney and solicitor. It may be, not upon any retainer. A retainer is not necessary to establish the relation. A volunteer stands in no better relation than a retained attorney. Roby was also jointly interested in the net profits of the land in controversy, and had an interest, with the Colehours, in the proceeds, if any, after the satisfaction of the mortgages and other liens. If his professional advice or assistance was brought into play to assist that joint interest, it was the advice of a solicitor,—not of a joint defendant,—and the relation of solicitor and client must be held to be as well established as though there had been no joint interest. This ruling must be held equally applicable to the relation of the parties from 1873 up to the sale under the foreclosure decree.

"It appears that Roby, the defendant, now claims to own all the lands and lots, subject to the foreclosure sale; that he claims the entire equity of redemption, and that neither Charles W. Colehour nor William H. Colehour has any interest whatever in the land, proceeds or net profits thereof. The equity of redemption is admitted to be worth $200,000. As stated, he claims the Colehours embezzled moneys derived from sales

to an amount sufficient to extinguish their interests and leave him sole owner of whatever remains, if any, of the net profits. That can not here be determined now, and is a question to be determined upon an accounting.

"The defendant claims to own the legal title to the property in question by virtue of purchases under certain judgments rendered against Charles W. Colehour and William H. Colehour, and against them individually, and by reason of pur- chases made from persons who bought at the judgment sales, some of which judgments grew out of transactions connected with the land adventure, and others out of the personal debts of the judgment debtors. There were a number of judgments : The Mechanics' National Bank judgment, in 1875, for $2625 ; the O. H. Horton, receiver, judgment, in 1878, for $4113.58 ; the C. B. McCoy judgment, for $3700 ; the Crane Bros. Man- ufacturing Co. judgment, in 1879, for $3591 ; the Harding judgment, and others not necessary to mention. The titles derived under the judgments the proof tends to show cost the defendant less than $1500.

"It is claimed by the complainant that the purchases under the judgments, and the titles made under the sales thereunder, were so made under agreements with Roby, and that large amounts of securities were placed in his hands for the purpose of protecting the interests of the Colehours and his own in the lands. The evidence is conflicting as to any special promises or undertakings of Roby in regard thereto. It is unnecessary to decide whether such were made or not. If Roby had any securities he must account therefor.

"The question which underlies this claim of Roby of title under or through these judgments, is.this : Did Roby occupy towards the Colehours a business relation fiduciary in its char- acter as to the Colehours, or a position of trust and confidence, which forebade him so purchasing such lots and lands and holding them adversely to the Colehours? The complainant contends that Roby's one-fourth interest was given solely in

consideration that Roby would act as the legal adviser of the enterprise or adventure. The evidence shows that Roby paid as much as $4400 in money on the purchase from Hansbrough, and the allegation of complainant as to the services being the sole consideration is not sustained by the proof. The evidence shows, that from 1873, when Roby became interested in the property, he was at the office where the business of the trust or joint adventure was carried on, several times a week, examining lot-books, books of sale, and consulting and advising as to such business, and that the Colehours received and relied upon his legal advice in matters in which they were jointly interested. This continued until the business of selling lots was practically ended by the refusal of the Clarkes to release lots, which refusal was in 1878 or 1879. There is also evidence that other attorneys acted for the Colehours in various court proceedings, but the consulting attorney in matters of trust or adventure was the defendant, Roby. It does not, however, appear that he made any charge for such services, or received any retainer or compensation. I do not understand that Roby denies having given legal advice as to the trust or land matters, but claims that he did so only to a limited extent, and then only as a joint owner or party jointly interested.

"The Supreme Court, in the *Morrill case,* 82 Ill. 618, has decided that an agreement of the nature made by the declaration of trust gives no interest in the land, but is in the nature of a joint adventure or partnership. Partners are termed *quasi* trustees for each other, and a fiduciary relation exists between them. The dealings of the partners with each other, and the subject matter of their relation, are governed by the same rules which determine the duties of actual trustees towards their *cestuis que trustent.* (Pomeroy, sec. 1088.) One duty is, not to do any act inconsistent with the interests of the other partners in the co-partnership. The rule applies to agents, partners, etc., says Pomeroy, as well as technical trustees, and that the most important phase of this rule is

that which forbids trustees and all other fiduciaries from dealing in their own behalf with respect to the matters involved in the trust, and this prohibition operates irrespectively of the good faith or bad faith of such dealings.    Pomeroy, sec. 1077, and cases cited.

"Under this authority—and it is unquestioned law—Roby could no more buy the land in question and hold it adversely to those jointly interested with him in this joint adventure or partnership, than he could have done if he had been a trustee and the Colehours the *cestuis que trustent* under an express trust.    The law will hold Roby to be a trustee for the Colehours—for C. W. Colehour to the extent of one-half, and W. H. Colehour one-quarter, of all the property so purchased by him under or through such judgment proceedings, he, however, to be refunded the moneys which he has paid therefor.   He can not hold the property, because he must be treated as acquiring it while the relation of attorney and client existed.

"As stated in regard to his (Roby's) connection with the Clarke foreclosure, if Roby's professional services and advice were brought into play and given (as I have found they were) to assist this joint adventure or partnership, he occupied the relation of solicitor towards the trust or adventure, and he can not be heard to say he acted or advised only as a party jointly interested.    The position he occupied gave him the same opportunity to inspire confidence, to acquire an undue influence, to obtain knowledge of the subject matter of the relation between them, of the judgments, liens, state of title, as if he had been only a feed attorney or solicitor of the Colehours. He, whether called joint owner or attorney, must be governed by the same rules, trusts, incapacity of dealing, as if such relation of solicitor and client, and none other, existed.

"There is only one remaining question of importance in this case.   The bill makes an attack upon the deed by William H. Colehour and wife to Edward Roby, made in 1887, and asks that it be declared null and void and of no effect, and set aside

as a cloud upon the title of complainant and said William H. Colehour. The complainant can not obtain all the relief prayed. If there was a fraud on William H. Colehour, or a cloud on his title, he must seek his own relief—this complainant can not for him. He is entitled to a decree that the conveyance of 1887 to Roby is void and of no effect, so far as it affects complainant's interests in said land, or under the said declaration of trust, because, first, Roby had notice of the deed of W. H. Colehour to C. W. Colehour of May 1, 1879, conveying the legal title to the land, subject to the trust; and second, because, so far as the right to one-half the profits is concerned, arising out of the declaration of trust made in 1873, such right is a mere chose in action, and transferable only subject to the equities of the original parties thereto. Even if the deed of May 1, 1879, had never been made, Roby could only hold the land under the deed of 1887, subject to complainant's right to one-half the net profits, under the declaration of trust.

"The cross-bill of W. H. Colehour recites the purchase of the land, the making of the two declarations of trust, and states the conveyances between the parties, the judgments, sales thereunder, as in original bill, and seeks relief upon substantially the same grounds. It also seeks the relief of setting aside the deed conveying the land, made by W. H. Colehour and wife to Edward Roby, in 1887.

"What I have said as to the rights and relations of the parties as being interested in a joint adventure, and the relation of attorney and client which grew out of that arrangement or partnership, will equally as well apply to the case of the cross-complainant. The legal title did not pass to Edward Roby, for the reason that when cross-complainant made the deed of 1887, it was in Charles W. Colehour by the conveyance of 1879, and Roby took with notice of that conveyance. Should the deed of 1887 be held to convey cross-complainant's equitable interest or right to one-quarter share of the net profits?

"As I have stated, Roby, not from any express retainer, but from the relation growing out of the business of the trust or joint adventure, had for years occupied the position of attorney towards both the Colehours. He paid for the conveyance of 1887 a grossly inadequate consideration, and obtained it under a claim of a just demand against cross-complainant for about $60,000 to $80,000, and under a threat to eject him from his homestead under title derived through one of the judgments referred to. It is not necessary to prove he acted fraudulently, but, under the circumstances, it was a hard and unconscionable bargain. The inadequacy of consideration and the undue influence of Roby over cross-complainant, arising as aforesaid, would alone entitle complainant to relief as against that deed.

"The complainant and cross-complainant are entitled to the relief indicated in this opinion. There should be a receiver appointed, to whom all parties must convey, and in order to realize anything for any of the parties before the time of redemption expires, he should be given power to sell and make conveyances. An accounting should be had between the parties from the commencement of this joint adventure. The alleged verbal settlement of 1879 is not sustained by the evidence, and will be disregarded as a settlement.

"I have disposed of this case, as will be observed, without any finding as to actual or intentional fraud on the part of Roby, and it gives me pleasure to be able to state that the gross charges of fraud—among others, as to his having stolen the declaration of trust from its place of deposit, that the deed of W. H. Colehour to him was a forgery, and that he offered to betray his client, Clarke, in 1872 or 1873—are not proven by the evidence in this case. Several of the charges against him were evidently maliciously made, and with intent to injure him professionally. Solicitors, however, must be made to know that when drawn into professional and confidential relations with parties, whether by retainer or growing out of business connections with such parties, they can not acquire an adverse

interest in the property or subject matter out of which such relations arose, even though no actual fraud be intended, and can not even do so after such relations have ceased, if the influence thereof still exists.

"If the complainant and cross-complainant desire any amendment, to meet the views expressed, they can prepare the same, but the order for a receiver and conveyances to such receiver may be prepared and entered at once."

A decree having been entered in conformity with said opinion, Roby now brings the record to this court by writ of error and assigns error.

Mr. W. N. Low, for the plaintiff in error:

An attorney may contract with his client, if no advantage be taken of the confidential relation. *Cane* v. *Allen*, 2 Dow, 289; *Montesquieu* v. *Sandys*, 18 Ves. 301; *In re Executors of Atkin*, 4 B. & A. 47; *Luxmore* v. *Sethbridge*, 5 id. 98; *Lees* v. *Nuttall*, 1 R. & M. 53; *Hunter* v. *Atkins*, 3 id. 113; *Austin* v. *Chambers*, 6 C. & F. 1; *Casborne* v. *Barsham*, 2 Beav. 76; *Laclede Bank* v. *Keeler*, 109 Ill. 391; *Wright* v. *Tibbits*, 91 U. S. 252; *McPherson* v. *Cox*, 96 id. 404; *Morrison* v. *Smith*, 130 Ill. 304; *Hess* v. *Voss*, 52 id. 481.

Roby had the right to purchase his co-tenants' interest, either at private or judicial sale. *Burr* v. *Mueller*, 65 Ill. 262.

A purchase of an outstanding title is not void, nor does the interest acquired by it vest in the co-tenants. Freeman on Co-tenancy, sec. 156; *Brittin* v. *Handy*, 20 Ark. 403.

A co-tenant must elect to participate within a reasonable time, and must offer to do so, or he will be deemed to have repudiated the transaction and abandoned its benefits. Bates on Partnership, 311, 312; *Mandeville* v. *Solomon*, 39 Cal. 133.

As to the right of Roby to buy the property at a judgment sale, or to purchase the judgment, see 1 Bates on Partnership, secs. 308, 311-313, 540, 543; *Wheeler* v. *Sage*, 1 Wall. 418; *Drew* v. *Beard*, 107 Mass. 73; *Bissell* v. *Foss*, 114 U. S. 252.

One of two defendants at a sale on execution against both may become a purchaser of the land of the other. *Mathis* v. *Stufflebeam,* 94 Ill. 481; *Gibson* v. *Winslow,* 38 Pa. St. 49; Freeman on Executions, 292.

Mr. H. S. Monroe, for the defendants in error:

The declaration of trust under which Roby, the plaintiff in error, claims, made Charles W. Colehour, William H. Colehour and himself jointly interested, and partners in the profits to be derived from the improvement, conveying and selling the land in question, and gave to Roby no title to the land itself. *Morrill* v. *Colehour,* 82 Ill. 618; *Boone* v. *Clark,* 129 id. 466.

The joint interest of the partners was such that Roby's purchase inured to the benefit of his partners, upon being reimbursed their due proportion. Pomeroy's Eq. Jur. 1077, 1088, and cases there cited.

The conduct on the part of Roby was unjust and fraudulent to the Colehours, and he holds the title thus acquired in trust for those equitably interested in the land. Bishop on Non-Contract Law, sec. 706; Story's Eq. Jur. sec. 311, and cases cited; *Hunter* v. *Atkins,* 3 M. & K. 113; *Edwards* v. *Myrick,* 2 Hare, 60; *Zeigler* v. *Hughes,* 55 Ill. 288; *Smith* v. *Brittenham,* 109 id. 540.

The deed from William H. Colehour and wife, of January, 1887, is void as to William H. Colehour, and must be set aside, first, because Roby had been acting as the attorney of William H. Colehour, and then pretended to be so acting; second, because Roby was jointly interested with William H. Colehour in the profits to be derived from this venture, and did not disclose to him the then existing facts, but grossly misrepresented them; and third, because of the confidential relations existing between them, he was bound to pay a fair and adequate compensation for William H. Colehour's interest, which he did not do, but by false representations and threats induced William H. to part with his interest for a grossly inadequate con-

sideration. See cases before cited; *Clark* v. *Palmer*, 8 C. & F. 657; *Spencer* v. *Topham*, 22 Beav. 573; *Lewis* v. *Hellman*, 3 H. of L. Cas. 706; *Bayless* v. *Williams*, 6 Coldw. 440.

Mr. W. C. GOUDY, also for the defendants in error.

Per CURIAM: As we are disposed to concur, substantially, with the views expressed by the learned chancellor who heard this case in the court below, we shall content ourselves with considering briefly two or three propositions which are very earnestly pressed upon our attention by the counsel for the plaintiff in error in his argument here. The facts involved in the case are numerous and complicated, and the evidence is very voluminous and as to almost every material matter it is directly conflicting. We have given the record as thorough and exhaustive an examination as the time at our disposal has rendered possible, or as the questions argued here have seemed to demand. Upon such examination we have reached the conclusion that the construction placed upon the evidence by the chancellor, and the findings of fact made by him are fairly warranted by the record.

The evidence shows—and as to this there is no dispute—that at the time of the original purchase of the land in controversy from the Clarkes in 1871, and the conveyance of it to William H. Colehour, as trustee, Hansbrough, Morrill, Corby and Charles W. Colehour embarked in a joint enterprise, in which they undertook to purchase 406 acres of vacant land near the city of Chicago, with a view of subdividing and platting it into blocks, lots, streets, etc., and of otherwise improving it as suburban property, and of then selling it at a profit, the net profits to be divided between them in certain proportions then agreed upon. Morrill and Corby subsequently surrendered or abandoned their interests, and in 1873, the Hansbrough interest was, for a certain consideration, assigned and transferred to Roby, the plaintiff in error, and Charles W. Colehour, and by a declaration of trust then executed by William H. Colehour,

it was provided that the net profits of said enterprise, after the payment of all incumbrances and all moneys advanced by either party, should be participated in by said parties in the following proportions, viz: one-half by Charles W. Colehour, one-fourth by Roby and one-fourth by William H. Colehour. From that time manifestly these parties sustained the same relation to each other that existed between Hansbrough, Morrill, Corby and Charles W. Colehour in the original enterprise.

In *Morrill* v. *Colehour*, 82 Ill. 618, we had before us the declaration of trust executed by William H. Colehour to Morrill, Corby and Charles W. Colehour, providing for their joint participation in one-half of the net profits arising from the sale of said land, and we there held that the beneficiaries under that instrument took no interest in or title to the land itself, but that their interest was only in the profits, as to which their relation was that of partners. The declaration of trust between the parties in this case is, so far as this question is concerned, in substantially the same terms, and must therefore receive the same interpretation, and it must be held, in effect, to establish between them the relation of partners, and to give them the rights and impose upon them the duties and disabilities incident to that relation.

We are of the opinion also that the evidence fully justified the court below in finding that Roby, from the time he acquired his interest in said joint enterprise up to a short time prior to the filing of the bill in this case, sustained in fact to the Colehours the relation of attorney and legal adviser, and that during a large portion of that time he was frequently in the office where the business of said trust or joint adventure was being carried on, examining the books and advising and consulting as to the business, and that the Colehours received and relied upon his legal advice in the matters in which they were jointly interested.

Counsel now takes the position, if we correctly understand him, that, admitting the facts to be as found by the court

below, namely, that Roby was jointly interested as partner with the Colehours in the profits to be realized from the improvement and sale of said land, and also that he held the confidential relation to them of attorney and legal adviser, these facts constituted no obstacle to Roby's acquiring title to said land adverse to the Colehours, and that the court therefore erroneously held that, in obtaining title to said land through said sheriff's sales, he must be deemed to have purchased and to hold the legal title to the land as trustee for himself and the Colehours, subject only to the right to be reimbursed for the moneys expended in making such purchases.

The doctrine on this subject is too well settled to make it our duty to follow counsel through his labored argument and his voluminous citation of authorities, or even justify us in so doing. The general principles universally recognized in matters of this character are well stated by Lord Chelmsford in *Tate* v. *Williamson*, L. R. 2 Chan. App. Cas. 55, as follows: "The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise. Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no confidential relation had existed."

The relations to which these principles are applied are very numerous, and among those to which they are so applied by a substantial concurrence of all the authorities are those of

22—135 Ill.

attorney and client, trustee and *cestui que trust,* principal and
agent, partners, and part owners of property.    Willard's Eq.
Juris. 170; 2 Pomeroy's Eq. Juris. sec. 955, *et seq.;* 1 Story's
Eq. Juris. sec. 307, *et seq.;* Bispham's Eq. sec. 231, and au-
thorities cited in notes.    Indeed, as said by Mr. Pomeroy, "It
is settled by an overwhelming weight of authority, that the
principle extends to every possible case in which a fiduciary
relation exists in fact, in which there is confidence reposed on
one side, and the resulting superiority and influence on the
other.    The relation and the duties involved in it need not be
legal; it may be moral, social, domestic or merely personal."
2 Pomeroy's Eq. Juris. sec. 956.

In cases of partnerships, which usually involve also the re-
lations of joint ownership, trust and agency, the utmost good
faith is due from every member of the partnership towards
every other member, and if any dispute arises between part-
ners touching any transaction by which one seeks to benefit
himself at the expense of the firm, he will be required to show,
not only that he has the law on his side, but that his conduct
will bear to be tried by the highest standard of honor.    1 Lind-
ley on Partnership, 303; 1 Bates on Partnership, sec. 303;
Parsons on Partnership, 222.    If one partner therefore buys
an outstanding adverse title to property belonging to the firm,
or acquires an interest in its property without his copartner's
assent, which would be beneficial to the firm, the purchase will
be deemed to be for the firm.    1 Bates on Partnership, sec. 305.

The authorities in support of these rules are ample.    Thus,
in *Forrer* v. *Forrer's Exr.* 29 Gratt. 134, certain partners bought
a tract of land for partnership purposes and it was conveyed
to them.    After the death of one of them, it was ascertained
that the title to one-third of the land was defective, and the
surviving partner purchased this one-third interest and took a
conveyance to himself.    It was held that he purchased for the
joint benefit of himself and the heirs of the deceased partner,
and that they were entitled to claim it upon paying their shares

of the expense of the purchase. The court say: "Whenever two or more persons having a community of interest hold an imperfect title, and one of them buys in an outstanding title, such purchase will enure to the common benefit, upon contribution made to repay the purchase money. The rule is based upon the community of interest in a common title, creating such a relation of trust and confidence between the parties that it would be inequitable to permit one of them to do anything to the prejudice of the other in reference to the common property." So, in *Lamar's Exr.* v. *Hale*, 79 Va. 147, it was held that partners stand in the relation of mutual agents and trustees, and can therefore acquire the property of the firm only for the benefit of the firm. In *Kinsman* v. *Parkhurst*, 18 How. 289, the same principle was applied to a partnership between a patentee and another person, where the latter, after becoming a part owner of the patent and agreeing to conduct the business of manfacturing the patented machine on their joint account, set up, as against his copartner a right to manufacture said machine under a license from a third person. See also, *Farmer* v. *Samuel*, 3 Dana, 187; *Eakin* v. *Shumaker*, 12 Texas, 51; *Gillett* v. *Gaffney*, 3 Colo. 351.

On the same principle it is held that if a partnership have a valuable leasehold property of which the lease is about to expire, a partner can not privately, either during the continuance of the partnership or before its assets have been sold, obtain a renewal of the lease for his own benefit, but will be held to have obtained it in trust for the firm. *Featherston-haugh* v. *Fenwick*, 17 Vesey, 298; 1 Lindley on Partnership, 307, and authorities cited. In *Davis* v. *Hamlin*, 108 Ill. 39, this court applied the same principle in case of a confidential agent.

So far then as this branch of the case is concerned, it would seem to be quite immaterial whether, prior to Roby's purchases of the titles acquired through the execution sales and sheriff's deeds, he agreed to make such purchases and hold the

titles purchased for the benefit of himself and the Colehours, as Charles W. Colehour testifies, or whether he made such purchases entirely of his own accord and for his own benefit and without any consultation with his copartners, as his own testimony would seem to show. In either case the purchases must be deemed to have been made, and the titles purchased must be deemed to be held, for the benefit of the partnership, Roby, however, being entitled to be reimbursed by the Colehours for three-fourths of the moneys expended by him in buying in said titles.

Nor is the trust thus created within the operation of the Statute of Frauds. It is not an express trust, but one arising by construction of law. One of the most ordinary forms of constructive trusts is that which grows out of the rule of law which forbids a trustee or other person who occupies a fiduciary or quasi-fiduciary relation, from gaining any personal advantage touching the thing or subject as to which such relation exists. Bispham's Eq. sec. 92. Constructive trusts are expressly exempted from the operation of the Statute of Frauds. R. S. 1874, chap.59, sec. 9.

We are of the opinion that the court below properly held the deed of January 6, 1887, from William H. Colehour and wife to Roby to be inoperative and void so far as the rights of Charles W. Colehour are concerned, for the reasons stated by Judge Tuley in his opinion.

We are also of the opinion that said court properly set aside and vacated said deed in accordance with the prayer of the cross-bill, on the ground of inadequacy of consideration and undue influence. The inadequacy of consideration results from the evidence as a conclusion of fact, and after duly considering all the evidence bearing upon that question, we perceive no reason for holding that the court below was not fully warranted in drawing that conclusion. So far as the evidence of undue influence is concerned, the preponderance seems to be clearly in favor of William H. Colehour, and if the account of

the transaction given by his witnesses is to be believed, the propriety of the decision of the court in this respect is manifest, especially when taken in connection with the fact, which as we have said the evidence in our opinion warranted the court in finding, that at the date of said deed Roby was, and for several years prior thereto had been Colehour's attorney and legal adviser.

It is not the doctrine of courts of equity that attorneys are, by their fiduciary position, wholly incapacitated to purchase from their clients, nor does such incapacity ordinarily exist in case of other fiduciary relations. The rule however is, that the presumption is always against the validity of transactions of that character, and the burden is on the attorney to remove that presumption, by showing affirmatively the most perfect good faith, the absence of undue influence, a fair price, and knowledge, intention and freedom of action on the part of the client, and also that he gave his client full information and disinterested advice. *Jennings* v. *McConnell*, 17 Ill. 148; *Hess* v. *Voss*, 52 id. 472; *Laclede Bank* v. *Keeler*, 109 id. 385; *Morrison* v. *Smith*, 130 id. 304; 2 Pomeroy's Eq. Juris. sec. 960; 1 Story's Eq. Juris. sec. 311; Mechem on Agency, secs. 877-879; Weeks on Attorneys, sec. 268.

Tested by this rule, the transaction by which Roby obtained from William H. Colehour a conveyance of the latter's interest in the land in question can not be upheld. The preponderance of the evidence fails to show an absence of undue influence, but rather the contrary, nor does it establish a fair and adequate consideration. Even if we disregard all those misrepresentations charged in the bill and cross-bill as to which the evidence is conflicting, it is undisputed that Roby insisted then, as he does now, that by the execution sales the legal and equitable interests of both William H. Colehour and his brother had been extinguished or had been transferred to him, and that no title or interest remained in the Colehours, except perhaps their statutory right to redeem from the sale under

the judgment in favor of the Crane Brothers Manufacturing Company which had not then expired and the inchoate right of dower in the wife of William H. Colehour. It is unquestionable that the advice then given by Roby to William H. Colehour and his wife was upon the basis of this assumption as to the rights of the parties. Roby admits that at the negotiation which resulted in the deed from William H. Colehour and wife to him, he produced and exhibited the sheriff's certificates and deeds evidencing his title under the execution sales and claimed such title in himself as those instruments purported to convey, and there can be no question that his advice to Colehour and wife as well as the entire negotiation proceeded upon that basis. But this advice, as we have already seen, was erroneous and therefore misleading, as the only equitable right, as against the Colehours, acquired by Roby through the sheriff's sales was the right to be reimbursed by the Colehours to the extent of three-fourths of the moneys expended by him in buying in those titles. Furthermore, the consideration was undoubtedly fixed and agreed upon by Roby and Colehour on the same basis, viz, that Roby had already acquired both the legal and equitable interests of the Colehours. It may be, if that had been the fact, that the consideration would have been adequate, but we think it clearly was not so, in view of the rights of the Colehours as they actually were.

We fail to find such evidence of subsequent acquiescence or ratification by William H. Colehour as should now be held to bar his right to have said deed rescinded and cancelled. The evidence shows, it is true, that shortly after the deed was executed, Colehour directed various tenants on the land to pay rent to Roby, informing them at the same time that he had conveyed all his interest to him, and it also appears that for some months thereafter he remained on friendly terms with Roby and visited him frequently both socially and on matters of business, and that during that time he made no attempt to

repudiate said deed. It does not appear, however, so far as we are able to discover, that while this state of things existed, Colehour was aware of the true nature and extent of his rights, or had ascertained that Roby, in buying in the titles acquired under the sheriff's deeds, was charged by construction of law as trustee for himself and the Colehours, and that he held the titles thus purchased only in trust. Before William H. Colehour can be held to have validated his voidable deed, it must appear that, at the time of the alleged ratification, he had been made aware of the nature and extent of his actual rights or at least that he had learned that the advice received by him from Roby was incorrect.

Nor does the evidence, in our opinion, charge Charles W. Colehour with such laches as should be held to bar his right to relief. According to his testimony, he supposed that Roby, in purchasing the titles under the execution sales, was doing so in the interest of himself and the Colehours, under an express arrangement by which he was to buy in those titles and hold them subject to the same trust upon which the land was originally held by William H. Colehour. This express arrangement is denied by Roby, but if it was never entered into, still, as we have seen, the law, by construction, constituted Roby a trustee of a trust the terms of which were of substantially the same character as that alleged by Colehour. It thus appears that in any view of the evidence Roby held the titles purchased by him in trust. Now it is not shown at least by a preponderance of the evidence that Colehour was made aware in any way that Roby was disposed to deny the trust relation and claim adversely to the Colehours until about the time of the sale under the Clarke foreclosure decree, and the present bill was filed in apt time thereafter.

Being of the opinion that the decree of the court below is fully warranted by the pleadings and evidence, the judgment of this court will be that said decree be affirmed.

*Decree affirmed.*