WILLIAM J. DAVIS

*v.*

JOHN A. HAMLIN.

*Filed at Ottawa November 20, 1883.*

1. AGENCY—TRUST—*duty of agent in regard to principal and his business.* In the employment of an agent the principal bargains for the disinterested skill, diligence and zeal of the agent for his own exclusive benefit. There rests upon one becoming agent the duty of fidelity to his employer's interest, and of acting for the furtherance and advancement of the business in which he engages, and not in its injury.

2. Where a confidential agent of one having a lease of a theatre, who, from his position, was well acquainted with the profits of his principal in the use of the building, and who knew, some months before the old lease expired, that the latter was desirous of renewing his lease, offered privately to lease the theatre of the owner, proposing to give a larger rental than was reserved in the old lease, and denied to his principal that he was competing with him for the lease, but in fact did procure a lease to be made to himself, it was *held*, that the benefit of such lease a court of equity would hold to inure to his principal, and that the agent would be held to hold the same as a trustee for his principal.

3. Courts of equity recognize a reasonable expectation of a tenant of a renewal of his lease as an interest of value, and hold that the act of an agent in the management of the lessee's business, in interfering with and disappointing such expectation by procuring the lease to himself, is inconsistent with the fidelity which the agent owes to the business of his principal, and a court of equity will give the principal the benefit of the new lease.

4. In applying this rule the nature of the relation is to be regarded, and not the designation of the one holding the relation. It is applied not only to persons standing in a direct fiduciary relation toward others, such as trustees,

executors, attorneys and agents, but also to those who occupy any position out of which a similar duty ought, in equity and good conscience, to arise.

5. The knowledge which one acquires as trustee or confidential agent, is of itself a sufficient ground of disqualification, and of requiring that such knowledge shall not be allowed to be used for his own benefit to the injury of the trust, or in violation thereof.

6. Where one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or of the law, so that he becomes interested for him or with him in any subject of property or business, he will in equity be prohibited from acquiring rights in that subject antagonistic to the person with whose interest he has been associated.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

This was a bill in equity, brought by John A. Hamlin, against William J. Davis, seeking to have the latter declared to be a trustee for the former of a certain lease of the Grand Opera House in Chicago, which Davis had obtained for himself from William Borden. Upon the hearing the circuit court decreed the relief prayed for. The decree was affirmed by the Appellate Court for the First District, and the defendant appealed to this court.

The facts appearing from the evidence are, that Hamlin was the lessee and manager of the theatre known as the Grand Opera House, in the city of Chicago, and for some ten years had occupied the premises, first as owner, and then as lessee. After the Chicago fire, in 1871, he purchased the lots and built thereon the building, and has used it since that time as a place of amusement. He expended in its construction and improvement over $75,000. Mortgages had been given upon the lots, which were finally foreclosed, and he lost the title to the lots. Subsequently he became a lessee, and contracted with William Borden, who was then the owner of the premises, that the latter should fit up the house for a first-class opera house, and that he would pay him a rental, after it was finished, amounting to about $18,000 a year.

The building being completed about the month of August, 1880, Hamlin entered into the possession, and opened it as a place for first-class entertainments. He had a lease which would expire April 23, 1883, and it was his intention to continue permanently in this building in the amusement business, and at the expiration of his lease to renew it. During the first year after opening his new opera house, about the first of September, 1880, he cleared, over and above all expenses, the sum of $7000, and the next year, from September, 1881, to September, 1882, $24,000. When he was about to open in September, 1880, he secured the services of William J. Davis, the defendant, as a general business manager. The evidence shows that the duties of a manager or assistant manager are to correspond with companies, operas, troupes, etc., for engagements of from one to four weeks, according to their acceptableness, and so arrange the engagements that they will follow one another in future months without loss of time. In making these engagements it is necessary to show the exact expense of the house each night, including rent, and the custom of business is to make a settlement between the proprietor of the theatre and the manager of the attraction, and divide the money every night. Davis, about September, 1880, entered upon the discharge of his duties, and from that time until the making of the lease in question continued in the management of the theatre. For this service he received $50 per week as a fixed salary, and ten per cent of the profits.

Respecting the renewal of the lease there is but the uncontradicted testimony of Davis and Hamlin themselves. Davis testifies the first negotiation he had with Borden was about December 1, 1881. He went to Borden for the purpose of purchasing the theatre, and offered $200,000 for it. Borden did not care to sell, and inquired what rent Davis would be willing to pay, and Davis said, ten per cent on Borden's valuation of it, if it did not run above $225,000. Borden asked

Davis if he would give that rent, and Davis said he would, if there was any use of his making an offer for it,—if the theatre was in the market. Borden said he was going to New York, and would see Davis on his return. Davis says he next saw Borden on the 19th of January, 1882, when he called upon Borden in Chicago in response to a note from Borden to do so. Borden then inquired of Davis what he would give for the lease of the theatre. Davis told him. Borden did not accept the offer, but asked Davis to see him another day, and after further negotiation, Borden, on the 24th of January, 1882, executed to Davis a lease of the theatre for the term of ten years, at the rental of $22,500 per year. Davis says he told Borden, at the interview on January 19, that Hamlin would pay him nearly double what Davis offered for the theatre, because Hamlin had told him (Davis) that he would pay $40,000 a year for the theatre, and sink $10,000 from his private income, before he would surrender it, but Borden said he thought Hamlin was "blowing."

Hamlin testifies that soon after the opening, in 1880, he made application to Borden for a lease to him and one Nunnemacher for twenty years, which Borden declined, then, to give; that the next talk he had with Borden was in New York, between the middle of December, 1881, and the middle of January, 1882, when he told Borden he would take a lease for any term of years, and would pay all that it was possible for any prudent business man to pay, and would pay as much rent as anybody. Borden said he would talk it over the next week in Chicago. Subsequently he had two interviews in Chicago with Borden on the subject. At the second one he offered $20,000 per year rent, but Borden declined to take it, saying he must see the other parties first; that there were two persons he had offers from; that they were managers, and Chicago men. Hamlin testifies that he went immediately to Davis, and inquired of him if he was attempting to secure a lease of the Grand Opera House, and Davis answered

no,—that he was not. He said he then told Davis what he had just learned from Borden, and that he would pay double the value of the theatre rather than anybody else should have it. Davis said to him: "I would not give an extravagant price for it, if I were you; I would not give a dollar more than it is worth." The parties agree as to this interview and conversation, differing only as to its date, Davis testifying that it was on the 17th, and Hamlin that it was on the 23d of January, 1882.

The evidence was that a theatre well managed has a good will, of value, attached to it; that there were only four first-class theatres in Chicago, including the Grand Opera House, and there was no probability that Hamlin could get another theatre without building a new one.

Mr. EGBERT JAMIESON, and Mr. L. W. PERCE, for the appellant:

The relation of principal and agent did not exist between Hamlin and Davis in regard to the subject matter of renewing the lease. *Fairman* v. *Bavin,* 29 Ill. 75.

The relation of master and servant, and that of trustee and *cestui que trust,* are not identical, nor does the one necessarily involve the other. The relation of employer and employé is not a confidential one. Story's Eq. Jur. sec. 1195; *Cook* v. *Fountain,* 3 Swanst. 591; Wharton on Agency, sec. 19; Bigelow on Fraud, 231; Paley on Agency, 12; *Deep River Mining Co.* v. *Fox,* 4 Ind. 61.

The application of the principles governing the relation of trustee and *cestui que trust* is limited to dealings with the trust estate. In all matters not connected with the subject of the trust the parties are fully competent to deal with each other, with third parties or strangers. *Knight* v. *Majoribanks,* 2 Mac. & G. 10; *Montesquiea* v. *Sandys,* 18 Ves. 308; *Crane* v. *Lord Allen,* 2 Dow, 289; *Ex parte James,* 8 Ves. 352; *Gal-*

*braith* v. *Elder*, 8 Watts, 81; *McDonald* v. *Fithian*, 1 Gilm. 269; *Kennedy* v. *Keating*, 34 Mo. 25.

In every case reported in this State where parties have been declared trustees, the rule contended for is exemplified. Every case connects the trustee with the subject matter of the trust by directly and distinctly charging him with a duty in connection with such subject matter. *Casey* v. *Casey*, 14 Ill. 112; *Pensonneau* v. *Blakely*, id. 15; *Wickliff* v. *Robinson*, 18 id. 145; *Hitchcock* v. *Watson*, id. 289; *Dennis* v. *McCagg*, 32 id. 429; *Morris* v. *Taylor*, 49 id. 17; *Kerfoot* v. *Hyman*, 52 id. 512; *Cotton* v. *Holliday*, 59 id. 176; *Mason* v. *Bauman*, 62 id. 76; *Ely* v. *Hanford*, 65 id. 267; *Hughes* v. *Washington*, 72 id. 84; *Tewksbury* v. *Spruance*, 75 id. 187; *Eldridge* v. *Walker*, 80 id. 270; *Francis* v. *Kerker*, 85 id. 190.

When the party is not connected in a trust capacity with the subject matter of the trust, he can not be held as a trustee. *Fairman* v. *Bavin*, 29 Ill. 75; *Merryman* v. *David*, 31 id. 404.

A person holding a confidential position is not incapacitated thereby in regard to matters in respect to which he has no duty to perform. *Edwards* v. *Meyrick*, 2 Hare, 60.

The so-called tenant right of renewal confers no positive interest, either vested or contingent. It is a mere naked possibility, depending solely on the caprice of the lessor. A right of renewal must be the result of express contract. Taylor on Landlord and Tenant, sec. 332, note 2.

Mr. Leonard Swett, and Messrs. Quigg & Tuthill, for the appellee:

Any one who acts representatively, or whose office is to advise or operate, not for himself, but for others, is a trustee. 1 Lead. Cases in Equity, 238; Bigelow on Frauds, 190.

Wherever there is a relation which puts one party in the power of the other, a fiduciary relation exists. Evans on Agency, 256; Kerr on Fraud and Mistake, 182, 183.

In the employment of an agent the principal bargains for the disinterested skill, diligence and zeal of the agent for his own exclusive benefit, and whenever an agent is employed the principal is entitled to the intelligence, experience, care, skill and diligence of the agent, without any conflicting interests on his part prejudicial to the rights of such principal. Wait's Actions and Defences, title, "Agency," sec. 12, p. 245; Hilliard on Vendors, 369; Story on Agency, secs. 210, 211.

A person availing himself of a position of confidence to obtain an advantage, will not be permitted to retain it. Bispham's Equity, sec. 232; 1 Story's Eq. Jur. sec. 333.

A trustee must not put himself in a position which may have a tendency to injure the trust or interfere with his duties, and the knowledge which he acquired as trustee is of itself a sufficient ground of disqualification. *Hamilton* v. *Wright*, 1 Bell's App. C. 591; *Keech* v. *Sandford*, 1 Lead. Cases in Eq. 48.

Duty of agent to give his principal timely notice of every fact or thing that may make it necessary for him to take measures for his security: *Devall* v. *Burbridge*, 4 Watts & S. 305; *Brown* v. *Arrot*, 6 id. 416; *Bartholomew* v. *Leach*, 7 Watts, 172; *Clark & Co.* v. *Bank of Wheeling*, 17 Pa. St. 322.

Mr. CHIEF JUSTICE SHELDON delivered the opinion of the Court:

Under the facts in this case the only question arising is, whether Hamlin, by reason of Davis' agency and confidential relation to him, is entitled to the benefit of the lease executed by Borden to Davis.

In the employment of an agent the principal bargains for the disinterested skill, diligence and zeal of the agent for his own exclusive benefit. Upon entering into the employ of Hamlin, there rested upon Davis the duty of fidelity to his employer's interest, and of acting for the furtherance and

advancement of the business in which he was engaged, and not in its injury. We view the whole conduct of Davis in regard to the lease in question as violative of the duty of the relation in which he stood toward Hamlin. His first offer to rent the premises from Borden, about December, 1881, was an act hostile to the interest of his employer. He offered Borden a rent which was nearly $5000 in excess of the rent which Hamlin was then paying. Borden knew that this was an offer made upon an exact knowledge of the profits of the business, which Davis, from his employment, had peculiar means of knowing, and the natural effect would be to cause Hamlin to pay an enhanced rent when he should come to ask for a renewal of his lease. Davis violated the duty of his relation in concealing from Hamlin that he was attempting to get the lease. Davis excuses his denial to Hamlin of such attempt by saying that this was on January 17, and that it was true that at that time he was not making such an attempt, but had given it over, not up to that time having received any response from Borden to Davis' offer to rent, made on December 1, and that he was then, on January 17, making, or had made, preparations to go into another business. Taking this to be so, we find Davis only two days later, January 19, in the act of negotiation for the lease, and making an offer to Borden for the lease, which the latter took time to consider. Now, Davis knew that it was of vital importance to the interest of Hamlin that the latter should get a renewal of his lease; that Hamlin was most anxious to ascertain whether Davis—who alone, with Hamlin, had exact knowledge of the profits of the business—was in competition for the lease; and from Davis, only two days before, denying that he was competing for the lease, Davis knew, on January 19, that the belief was resting on Hamlin's mind, from what Davis had told him two days before, that Davis was not a competitor for the lease. Under these circumstances Davis ought to have disabused the mind of Hamlin of the impres-

sion, which Davis had caused, that the latter was not attempt-
ing to get the lease, and have informed Hamlin of what the
fact was, to give to the latter the opportunity to act accord-
ingly, and Davis' not doing so was a breach of good faith
toward his employer.

The obtaining of the lease by Davis amounted to a virtual
destruction of his employer's whole business at the termina-
tion of the old lease, under which the latter was holding. By
some ten years of labor Hamlin had built up a business of
a very profitable character. There was a good will attached
to it, which was valuable. Hamlin was intending to make it
a lifetime business. Sustaining this lease to Davis, at the
end of Hamlin's lease, April 16, 1883, all this business would
come to an end, and pass, good will and all, from Hamlin,
the employer, into the hands of Davis, the employe. And
this would have been accomplished by the means of a renewal
lease obtained by a confidential agent, in violation of the
duty of his relation, and acquired, presumably, because of
peculiar means of knowledge of the profitableness of the
business, afforded him by the confidential position in which
he was employed. A personal benefit thus obtained by an
agent, equity will hold to inure for the benefit of the prin-
cipal.

Public policy, we think, must condemn such a transaction
as that in question. To sanction it would hold out a tempta-
tion to the agent to speculate off from his principal to the
latter's detriment. Davis very well knew that his employer
would be willing to pay a much higher rent than that at which
he obtained the lease, and that he could dispose of the lease
to Hamlin at a large profit to himself, and such means of
knowledge was derived from his position as agent. If a man-
ager of a business were allowed to obtain such a lease for
himself, there would be laid before him the inducement to
produce in the mind of his principal an under-estimate of
the value of the lease, and to that end, may be, to mis-

manage so as to reduce profits, in order that he might more easily acquire the lease for himself.

It is contended by appellant's counsel that the rule we apply, which holds an agent to be a trustee for his principal, has no application to the case at bar, because Davis was not an agent to obtain a renewal of the lease, and was not charged with any duty in regard thereto; that his was but the specific employment to engage amusements for the theatre, and that he was an agent only within the scope of that employment; that Hamlin having a lease which would expire April 16, 1883, had no right or interest in the property thereafter, and that Davis, in negotiating for the lease, did not deal with any property wherein Hamlin had any interest, and that such property was not the subject matter of any trust between them. Although there was here no right of renewal of the lease in the tenant, he had a reasonable expectation of its renewal, which courts of equity have recognized as an interest of value, secretly to interfere with which, and disappoint, by an agent in the management of the lessee's business, we regard as inconsistent with the fidelity which the agent owes to the business of his principal. There was the good will of the business, which belonged to the business as a portion of it, and this the agent got for himself.

It is further argued that the relation here between Hamlin and Davis was that of master and servant, or employer and employe, and that the rule has never been applied to that relation as a class, and that the classes coming within that doctrine are embraced within the list of defined confidential relations, such as trustee and beneficiary, guardian and ward, etc. The subject is not comprehended within any such narrowness of view as is presented on appellant's part. In applying the rule, it is the nature of the relation which is to be regarded, and not the designation of the one filling the relation. Of this principle Bispham says: "The rule under discussion applies not only to persons standing in a direct

fiduciary relation towards others, such as trustees, executors, attorneys and agents, but also to those who occupy any position out of which a similar duty ought, in equity and good morals, to arise." (Bispham's Equity, sec. 93.) In *Greenlaw* v. *King*, 5 Jur. 19, Lord Chancellor COTTENHAM, speaking of this doctrine, says: "The rule was one of universal application, affecting all·persons who came within its principle, which was, that no party could be permitted to purchase an interest when he had a duty to perform which was inconsistent with the character of a purchaser." "It is the duty of a trustee," said Lord BROUGHAM, in *Hamilton* v. *Wright*, 9 Cl. & Fin. 111, "to do nothing for the impairing or destruction of the trust, nor to place himself in a position inconsistent with the interests of the trust." And on page 124: "Nor is it only on account of the conflict between his interests and his duty to the trust that such transactions are forbidden. The knowledge which he acquires as trustee is, of itself, sufficient ground of disqualification, and of requiring that such knowledge shall not be capable of being used for his own benefit to injure the trust." Although this was said of a trustee, we think it may be equally said here with respect to Davis and the business which he was employed to manage. The rule we apply, as to its broadness in extent, is aptly expressed in the American note to *Keech* v. *Sandford*, 1 Lead. Cases in Eq. 53, as follows: "Wherever one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or of the law, that he becomes interested for him, or interested with him, in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated."

The views which we have above expressed we believe to be in accordance with the well established principles of equitable jurisprudence. See *Devall* v. *Burbridge*, 4 Watts & S. 305; *Hill* v. *Frazier*, 22 Pa. St. 320; *Fairman* v. *Bavin*, 29 Ill. 75;

4—108 ILL.

*Gilman, Clinton and Springfield R. R. Co.* v. *Kelly*, 77 id. 426.; *Bennett* v. *Vansyckle*, 4 Duer, 462; *Gillenwaters* v. *Miller*, 49 Miss. 150; *Grumley* v. *Webb*, 44 Mo. 446.

The judgment of the Appellate Court must be affirmed.

*Judgment affirmed.*