## Consumers Company, Appellant, v. William H. Parker et al., Appellees.

### Gen. No. 7,052.

1. TRUSTS—*sufficiency of evidence to support allegations of bill to establish trust in lease.* On a bill by a corporation to establish a trust in and the assignment to it of a lease of premises brought against the lessors and against the lessees, the latter composing a partnership, evidence held to show that the premises in question were in possession of complainant, at the time the lease in suit was executed, that complainant had been seeking a new lease, that, at such time, one of the defendant lessees was in complainant's employ as superintendent and manager and knew of complainant's negotiations, that the other partner who negotiated the lease in suit knew of these facts, and to be sufficient to support the material allegations of the bill.

2. LANDLORD AND TENANT—*equitable recognition of tenant's expectancy of renewal of lease.* Even though a tenant may not have an absolute right to a renewal against the will of his lessor, courts of equity recognize his reasonable expectancy of a renewal as a property or asset.

3. LANDLORD AND TENANT—*renewal of lease obtained by fiduciary of lessee as impressed with trust in lessee's favor.* Where one standing in a fiduciary or quasi-fiduciary relation to a lessee secures a

renewal of the lease to himself, a court of equity will treat him as holding the lease in trust for the original lessee.

4. PARTNERSHIP—*one partner's knowledge of fraud as chargeable to the other.* Knowledge of fraud possessed by one partner in relation to the business or property of the firm is imputable to the other partner.

5. AGENCY—*rule prohibiting agent from profiting through relation at principal's expense.* Public policy forbids every fiduciary from in any manner dealing in the subject-matter of the relation and from using for himself any information gained by him in regard; the rule is not merely remedial, but is intended to be preventive.

6. AGENCY—*extent of principal's control of property to which agency relates as affecting fiduciary relation.* No interest in or control of the property to which the agency relates is essential in the principal to create a trust as between the principal and the agent where the agent acts as to the subject-matter of the agency, but it is created where there is a fiduciary relation and a breach of the duty imposed by such relation.

7. AGENCY—*want of intent to defraud as affecting creation of trust through dealings of agent with subject-matter of agency.* That no fraud was intended by the agent in dealing with the subject-matter of the agency does not affect the raising, by such dealing, of a trust as between the principal and the agent.

8. AGENCY—*absence of gain or damage as affecting raising of trust through agent's dealing with subject-matter of agency.* It is not material with regard to the raising of a trust for the benefit of the principal, where the agent deals for himself with the subject-matter of the agency, that no advantage was gained by the agent or no detriment was caused to the principal.

9. AGENCY—*confidential relation between principal and agent as dependent upon duties and powers of agent.* An employee of a corporation who has general management of its business in a branch office, is the highest employee in authority and superintendent of that division, occupies a relation of trust and confidence and is necessarily acquainted with knowledge of the fact that the corporation is seeking to renew a lease of the premises occupied by it at such point, therefore he cannot secure a lease of the premises for a partnership of which he is a member, and it is immaterial whether he had any discretion as to the making or renewal of leases on behalf of the corporation.

10. AGENCY—*when agent may not acquire interest adverse to principal.* The rule that an agent occupying a confidential relation to his principal may rightfully acquire an interest in the property of the principal adverse to the principal, provided he shows that he acted fairly in the transaction and took no advantage of the

principal, does not permit him to make use of confidence to procure for ·his own gain and without the principal's knowledge a lease in the premises occupied by the principal under a lease which the principal desires to renew, notwithstanding the agent secures such lease in contemplation of leaving his employment and using the premises in his own business.

11. TRUSTS—*when one seeking to establish trust not· guilty of laches.* On a bill by a corporation to establish a trust in a lease of premises occupied by it to which a subsequent lease had been secured by a partnership one of the members of which was an employee of complainant and occupied a confidential relation to it, evidence held not to show laches on the part of complainant in seeking to obtain a renewal of its lease.

12. TRUSTS—*when one seeking to establish trust in lease not chargeable with restraint of trade.* On a bill by a corporation to establish a trust in a lease of premises occupied by it under lease. to which a firm, having as one of its members a confidential employee of complainant, had secured a lease to commence at the expiration of complainant's term, *held* that defendant's contention that the purpose of complainant in procuring such lease was to stifle competition was without merit.

13. EQUITY—*application of maxim as to clean hands.* The rule that one coming into a court of equity must come with clean hands is confined to the conduct of the party in the matter before the court, not to matters *aliunde*, and the conduct relied on as barring one from equitable relief on this ground must relate to the other party to the instant litigation and must have been done in regard to the subject-matter of the litigation.

14. AGENCY—*presumption of bad faith where agent deals adversely to principal's interest.* Where a trusted employee acquires, either directly or indirectly, an advantage, either for himself alone or for himself and another, at his employer's expense, bad faith is presumed, regardless of the innocence of the employee's act according to his own standards of right and wrong.

Appeal by complainant from the Circuit Court of Kane county; the Hon. ADAM C. CLIFFE, Judge, presiding. Heard in this court at the October term, 1922. Reversed and remanded. Opinion filed January 24, 1923. Rehearing denied April 4, 1923. *Certiorari* denied by Supreme Court (making opinion final).

HEALY & BEVERLY and McKINLEY & SCHMAUCH, for appellant.

EGAN & TOBIN and McCARTHY & McCARTHY, for appellees.

Mr. Justice Jett delivered the opinion of the court.

Consumers Company, appellant herein, on the 15th of November, 1921, filed its bill in the circuit court of Kane county against William H. Parker, then superintendent and general manager of its Elgin branch, and others, to establish a trust in a certain lease which was granted to Parker and his codefendant, William Mitchell, as copartners of premises in Elgin, the major portion of which were then under lease to appellant under a demise which was about to expire, and for a renewal of which appellant was, to the knowledge of Parker and Mitchell, negotiating.

These lessors were also made defendants and a temporary injunction was issued against all of the defendants to hold the situation *in statu quo* pending a final decision of the rights of the parties. Answers were filed and on a hearing of a motion to dissolve the injunction, which developed into a final hearing, a decree was entered December 20, 1921, dissolving the injunction and dismissing the bill for the want of equity. An appeal was perfected by appellant and on December 29, 1921, a stay order was entered by this court continuing the injunction in force pending the appeal.

Among other things the bill alleged that appellant had for many years conducted, and was then conducting, a wholesale and retail coal and ice business in Elgin, and in connection therewith had developed a good will and trade of great value; that in the regular course of its said business, and on December 1, 1916, it acquired a leasehold to the premises and property known as the "Magnus Ice House Property," for the term of two years, with an option of renewal for three years more, at a uniform rental of $125 per month; that it exercised said option, thus extending the lease to December 1, 1921 (a date subsequent to the filing of the bill); that during all the time in question, appellee Parker was a confidential employee of appellant, and superin-

tendent and general manager of its Elgin branch; that on September 29, 1921, appellant, through James B. Kaine, its real estate officer, and through said Parker, its local superintendent and general manager, commenced negotiations with the trustees and executors of the Magnus estate (the lessors) for a renewal of the lease; that these negotiations continued and, on October 31, 1921, appellant, through its said agent Kaine, employed at its general office in Chicago, instructed its agent Parker, then in its employ at Elgin, in the aforesaid capacity, to arrange for a further interview with the lessors for the purpose of negotiating a renewal of said lease; that Parker agreed to arrange for such an interview and on November 1, 1921, did arrange with lessors an interview for November 4, 1921, and on said November 1, 1921, notified appellant that he had so arranged; that on November 3, 1921, lessors notified appellant that the premises had been leased to some one else; that appellant then made inquiry of Parker, who then for the first time advised that he and William Mitchell had secured a new lease to the premises, that his resignation was on the way, and that he had decided to go into the ice and coal business at Elgin upon the said premises with Mitchell; that Parker, while in appellant's confidence as general manager and superintendent, obtained knowledge of the expiration of the lease, of appellant's efforts to secure a renewal, and of the value and desirability of the leasehold; that Parker, coveting and desiring the same for his own purposes, clandestinely negotiated for a new lease of the premises on his own account, and on the account of said Mitchell, without appellant's knowledge, and secured a new lease of said premises to himself and Mitchell, with the purpose of occupying the premises as a coal yard and ice depot; that Parker utterly ignored the rights and interests of his employer in the premises, and the duty resting

upon and trust imposed in him, as a confidntial employee, and violated his instructions with reference to the securing of a renewal of the leasehold; that the leasehold is of great value to appellant; that Parker's employment with appellant in the capacity aforesaid was known to Mitchell, but, disregarding its rights, Mitchell and Parker conspired and confederated together for the purpose of depriving appellant of the use and enjoyment of the said leasehold and converting it to their own use; that Parker and Mitchell formed a copartnership for the purpose of conducting said business; that appellant has no knowledge of the terms of the lease procured by Parker and Mitchell, but the same are entirely within the knowledge of the defendants; that at the time of the new letting, the lessors knew that Parker was a confidential employee of appellant, and that he was violating the confidence and trust reposed in him in negotiating for and in securing for himself and Mitchell the said new lease; appellant offers to do equity, and to pay any instalments of rent, under said new lease; that unless injunction issue appellant will suffer irreparable damage, etc.

The prayer is that the defendants disclose the terms of the new lease; that the court decree that the new lease made by Parker and Mitchell is by them held in trust for appellant, and direct the assignment and delivery thereof to appellant; that a temporary injunction issue and be made permanent and that appellant have such other and further relief as the equities require.

A temporary injunction was granted November 15, 1921, as prayed, and on November 19, 1921, the appellees filed their several answers.

Parker's answer admits his employment by appellant at Elgin for seven years, and that he "has become somewhat familiar with the conduct and details of said business," but avers, "that the work performed

by him was that of a foreman directing the other persons employed in and around the premises and business, and the management of delivering ice and other commodities throughout the community,'' that he held no confidential information from the officers of appellant concerning its trade, properties, rights, contracts, leases, or financial affairs, and never made contracts for it other than employment of help and the sale of its products; admits the meeting on September 29, 1921, between the lessors, Kaine and himself, but avers that he took no part in the conversation; that lessors then informed Kaine they would not lease to any one else until October 31, 1921; admits the telephone call from Kaine on October 31, 1921, and the request of Kaine that an appointment be made for November 4 or 5, 1921; admits he then told Kaine he knew nothing of Hunter or Sherwood or what they were doing with the Magnus property; admits he agreed to convey Kaine's message to Hunter and Sherwood, and avers that Hunter and Sherwood told him that the time limit had expired, and that they would have no further dealings with the company, that they believed they could make better terms with some one else, but that Kaine could suit himself about coming to Elgin, and they would see him if he came; that on November 3, 1921, he tendered his resignation, and advised appellant that he and Mitchell had secured a lease of the premises; denies receiving any special confidence or information while in the employ of appellant; admits he knew of the negotiations between Kaine and the trustees, but when informed by the trustees on November 1, 1921, as above, he felt at liberty to enter into a partnership with Mitchell; denies all fraud, conspiracy or misconduct in his negotiations with Hunter and Sherwood, or in forming partnership with Mitchell; that he made no arrangement with Mitchell prior to November 1, 1921.

Mitchell's answer is a general denial; avers that

during the latter part of October, 1921, he undertook to lease said premises from the trustees and that he had no dealings whatever with reference to the lease with Parker; avers that Parker had stated to him that appellant had an option on said lease until the last of October; admits he knew Parker was in the employ of appellant, but he did not know his specific duties.

The answer of Hunter and Sherwood, the two active trustees and lessors, admits knowledge of Parker's employment, but not of his exact duties; admits lease of December 1, 1916; denies Kaine and Parker began negotiations with them for a renewal or new lease September 29, 1921, but avers that Kaine first called on them on September 14, 1921, to negotiate a new lease, but would not pay rent at the same rate; that they informed him they would not rent for any less and that the interview terminated without definite result; that September 29, 1921, Kaine called again and discussed the leasing or purchasing of said property; that they finally informed Kaine they would give appellant thirty days to secure a new lease of said premises, or to purchase the same; that Kaine left stating appellant would not pay the same rental as before; that they did not hear from appellant until after November 1, 1921, when Parker told them Kaine had called up asking him to make an appointment with the trustees for about November 4 or 5, 1921, to which they replied that they were through with appellant, as Mitchell had, during October, opened negotiations for a lease, and they were about to close with him; that they then called appellant at Chicago and informed Kaine that they were leasing to other parties; that November 3, 1921, they leased to Mitchell and Parker; that all negotiations were with Mitchell, that they had no conversations or dealings with Parker concerning it and did not know he was to be a party until the lease was being prepared on November 3, 1921, when Mitchell informed them that Parker was to be associated with

him and the lease might run to both as partners; that appellant has scarcely used said premises since they were first rented and the same have gone to decay to a considerable extent.

Attached to the answer is a copy of the new lease to Mitchell and Parker, dated November 3, 1921, for two years from December 1, 1921, and no provision against assignment or subletting. The answer of the other trustees admits the authority of Hunter and Sherwood to act for them, adopts the lease of November 3, 1921, and denies any fraud or conspiracy. Replications were filed to the answers, and a motion to dissolve the temporary injunction was made, and the hearing thereon developed into a final hearing of the case.

On the hearing of this cause, being the motion to dissolve, appellees took the initiative, and from the evidence it appears that for many years appellant was actively engaged in the coal and ice business at Elgin; that in connection with, and a part of its business, it owned and operated an artificial ice plant, ice houses for the storage of natural ice and a coal yard, and in connection therewith leased other properties, rights and privileges; that on December 1, 1916, it leased the Magnus ice house property, which lease expired December 1, 1921; that the obtaining of a new lease to said property for a further term was incidental to the business of it, in Elgin, and essential to its operation.

That on September 29, 1921, appellant, through its real estate agent, Kaine, began negotiations with the trustees of the Magnus estate for the renewal of the lease, or for a new lease thereof; that on October 31, 1921, said Kaine again took up the matter of the said lease, and requested a further appointment with the trustees, and such an appointment was made for November 4, 1921. The evidence further shows that during the time appellant had said Magnus leasehold, the appellee, William H. Parker, was in its employ as

general manager and superintendent of its Elgin branch, and as such was in a position of trust and confidence; that Parker knew of all the transactions had by appellant in regard to the said leasehold, the value of the same to appellant, its efforts to secure a renewal thereof, and the effect a failure to renew would have on the business of appellant; that Parker was present with Kaine during his interviews with the trustees, and Kaine made his request for a further appointment with the trustees, through Parker, and Parker did report to Kaine in writing, on November 1, 1921, that he had made a definite appointment for November 4, 1921; that Kaine relied on the appointment so made for him by Parker, and assumed that on November 4, 1921, he would be in a position to negotiate further with the trustees relative to a lease. Parker's testimony establishes the fact that on two occasions prior to the 15th of October, he was approached by outsiders with a view of interesting him, personally, in a rival business to be established on this property, and in each instance he remained faithful to his employer, and reported to his employer that others were considering the property. He did not report to them that he had been requested to take a personal interest in the matter. It is further shown that at about this time appellee Mitchell, a relative of Parker by marriage, became interested in the property. Mitchell had been engaged in the saloon business in Chicago and was seeking a business opening and his attention had been called to the Magnus property by a man by the name of Streator, a former general superintendent of appellant but discharged by it in 1919. Streator, it appears, disclosed to Mitchell the details of the Magnus property, the date of the expiration of appellant's lease thereon, and the names of the lessors, all of which he had learned while in the employ of appellant, and suggested to Mitchell that Parker might be interested in setting up a rival coal business on this property.

Mitchell called on the trustees and learned from them that appellant was negotiating for a new lease, and that the trustees would not lease to him if appellant completed its arrangements during the month of October. Mitchell proposed to Parker that they form a partnership and go into the coal and ice business on the Magnus property, if they could get the lease thereof. It appears that Mitchell and Parker, in October, discussed the establishing of a rival business on the Magnus property, the equipment needed and the costs of the same. An arrangement was made between Mitchell and Parker by which Mitchell was to furnish the capital and Parker was to receive $300 a month and also 25 per cent of the net earnings, the earnings to be allowed to accumulate until Parker became a half owner of the business; the $300 per month was the same salary Parker was then receiving from the appellant. It appears Mitchell told Parker of his talks with the trustees and that the trustees were holding off because of the arrangement with Kaine, and Parker told Mitchell that the appellant would never permit him to obtain a lease of the property.

This discussion between Mitchell and Parker, above alluded to, together with the arrangement made between them, were all during the month of October, 1921. Without further reciting what is disclosed by the evidence in this case, we have reached the conclusion, and are of the opinion, that the material allegations of the bill of complaint have been established by the weight of the testimony.

In view of the fact that we have reached the conclusion that the material allegations of the bill have been sustained by the weight of the evidence, the question then presents itself, is appellant entitled to the relief prayed for and does the law sustain its contention? In other words, the case for this court to consider and determine is whether the partnership composed of Mitchell & Parker, as against appellant, holds the

lease in question under the facts as disclosed by this record. Though a tenant may not have an absolute right to a renewal against the will of his lessor, courts of equity recognize his reasonable expectancy of a renewal as a property or asset, and if one standing in a fiduciary or quasi-fiduciary relation to a lessee secures a renewal of the lease to himself, a court of equity will treat him as holding the lease in trust for the original lessee. *Davis v. Hamlin,* 108 Ill. 39; *Gower v. Andrew,* 59 Cal. 119; *Essex Trust Co. v. Enwright,* 214 Mass. 407.

Mitchell and Parker are partners in the matter of Magnus lease. Each partner is agent of the other, and each is chargeable with a fraud, actual or constructive, as well as the knowledge of the other. In this case, Mitchell, it appears, had actual knowledge of the situation, and knowledge of fraud possessed by one partner in relation to the business or property of the firm is imputable to the other partner. *Huthmacher v. Lowman's Sons,* 66 Ill. App. 448; *Wolf v. Mills,* 56 Ill. 360; *Tenney v. Foote,* 95 Ill. 99.

Public policy forbids every fiduciary from in any manner dealing in the subject-matter of the relation, and from using for himself any information gained by him in regard thereto. The rule is not merely remedial, for wrong actually committed, but is intended to be preventive of wrong. Interest in or control over the subject-matter is not essential to the raising of a trust. It is of no consequence that no fraud was intended, that no advantage was gained by the fiduciary, or that no damage was done to the principal. *Davis v. Hamlin,* 108 Ill. 39; *Tyler v. Sanborn,* 128 Ill. 136; *Fox v. Simmons,* 251 Ill. 316; *Stemm v. Gavin,* 255 Ill. 480-486; *Trice v. Comstock,* 121 Fed. 620.

In the case of *Davis v. Hamlin, supra,* Hamlin was the lessee of the Grand Opera House in Chicago, under a lease which was about to expire, and Davis was the manager of the theater for Hamlin. During the

course of his employment, Davis learned of the expiration of the lease, the value of the property for the purpose for which it was used and that Hamlin was seeking a renewal of the lease, and the value of the theater to Hamlin and the amount of increased rental Hamlin was willing to pay to retain the leasehold. Without the knowledge of Hamlin, Davis sought and obtained a lease thereof, to begin upon the expiration of the Hamlin lease. Hamlin filed a bill to declare a trust in the said lease. It was there contended, on behalf of Davis, that the obtaining of a renewal of the lease was not within the scope of his duties, he being merely the manager of the theater, and charged only with the specific duty of engaging amusements and settling with the various show companies. In deciding the case adversely to the contention of Davis, the court on pages 45 and 46 said: "In the employment of an agent the principal bargains for the disinterested skill, diligence and zeal of the agent for his own exclusive benefit. Upon entering into the employ of Hamlin, there rested upon Davis the duty of fidelity to his employer's interest, and of acting for the furtherance and advancement of the business in which he was engaged, and not in its injury. * * * His (Davis) first offer to rent the premises from Borden * * * was an act hostile to the interest of his employer. * * * Davis violated the duty of his relation in concealing from Hamlin that he was attempting to get the lease. * * * Under these circumstances, Davis ought to have disabused the mind of Hamlin of the impression, which Davis had caused, that the latter was not attempting to get the lease, and have informed Hamlin of what the fact was, to give to the latter the opportunity to act accordingly, and Davis' not doing so was a breach of good faith toward his employer. * * * Public policy, we think, must condemn such a transaction as that in question. To sanction it would hold out a temptation to the agent to

speculate off from his principal to the latter's detriment. * * *

"*Although there was here no right of renewal of the lease in the tenant, he had a reasonable expectancy of its renewal, which courts of equity have recognized as an interest of value, secretly to interfere with which, and disappoint, by an agent in the management of the lessee's business, we regard as inconsistent with the fidelity which the agent owes to the business of his principal.* * * *

"It is further contended that the relation here between Hamlin and Davis was that of master and servant, or employer and employee, and that the rule has never been applied to that relation as a class, and that the classes coming within that doctrine are embraced within the list of defined confidential relations, such as trustee and beneficiary, guardian and ward, etc. *The subject is not comprehended within any such narrowness of view as is presented on appellant's part. In applying the rule, it is the nature of the relation which is to be regarded, and not the designation of the one filling the relation.*

"The doctrine is familiar, and has been often recognized by this court, that an agent cannot, either directly or indirectly, have an interest in the sale of the property of his principal, which is within the scope of his agency, *without the consent of his principal, freely given, after full knowledge of every matter known to the agent which might affect the principal.* * * * *It is of no consequence, in such case, that no fraud was actually intended, or that no advantage was, in fact, derived from the transaction by the agent.* * * * *The rule is not merely remedial of wrong actually committed,—it is intended to be preventive of wrong. Public policy requires* * * * *that a trustee may not put himself in a position in which, to be honest, must be a strain on him.* An agent may undoubtedly buy of his principal, or have an interest in the sale of property belonging to his principal, but in such case the burden is upon the agent to *show that the principal had knowledge, not only of the fact that the agent was*

*buying or interested but also of every material fact
known to the agent which might affect the principal,
and that, having such knowledge, he freely consented
to the transaction.''* Tyler v. Sanborn, 128 Ill. 136-
142, 143.

The rule as announced in *Tyler v. Sanborn, supra,*
is adhered to and reiterated in *Fox v. Simons,* 251 Ill.
316. Whenever two persons stand in such a relation
that while it continues confidence is necessarily re-
posed by one, and the influence which naturally grows
out of that confidence is abused, or the influence is
exerted to obtain an advantage at the expense of the
confiding party, the person availing himself of his po-
sition will not be permitted to retain the advantage,
although the transaction could not have been im-
peached if no confidential relation had existed. *Cross-
man v. Keister,* 223 Ill. 69-83.

In the case of *Trice v. Comstock,* 121 Fed. 620, com-
plainants filed a bill to charge certain lands, purchased
by the defendant Comstock and his brother, with a
trust in favor of the complainants.

Complainants were real estate dealers in Missouri,
and were in the habit of obtaining options on land
from the owners thereof and selling them at higher
prices and making the difference for themselves. The
lands in question had been priced to complainants by
an agent of the owners, and complainants believed the
agent had authority to price the lands to them, and to
give them an option thereon. On the hearing it de-
veloped that the agent did not have this authority.
Defendant C. W. Comstock, a banker in Iowa, had an
arrangement with complainants to take the prospec-
tive purchasers to Missouri, and on one of his trips
learned of the land in question and the details thereof.
In August, 1899, Comstock severed his connection with
complainants. In September, 1899, he bought and
paid for an option on the land from the owners, which
option he later assigned to his brother, who completed
the purchase. It was contended in that case that a

trust did not arise because the complainants did not have a valid option on the land, and did not have any interest in or control over them. In this connection the court said: "But no interest in or control of the property to which the agency relates is essential to the raising of the trust. The fiduciary relation, and the breach of the duty it imposes are sufficient in themselves." As to the duty resting upon Comstock, from the relations shown, the court further said: "The law imposed upon this agent, Comstock, the duty to use all the knowledge and all the benefits he derived from his agency to accomplish the purpose of his principals, and it implied an agreement on his part that he would faithfully discharge this duty. It forbade him to use it for his sole benefit or to prevent his principals from obtaining the object of the agency, and charged everything which he acquired by a violation of this inhibition with a constructive trust for their benefit." In this case of *Trice v. Comstock,* the court quite fully discusses the principles governing the fiduciary relation of employer and employee, and the rights and liabilities of each other with reference to property secured by the employee, through knowledge obtained during the course of the employment, and the contention of appellants is fully sustained.

It is suggested by appellees that according to the evidence of Parker he was merely "an errand boy," touching the securing of the leasehold in question. Parker when asked by his counsel to detail the work done by him testified: "I was engaged in selling their goods, collecting the money, managing the delivery of goods. I had the general management of the Elgin office." Parker was superintendent of the Elgin division on a salary of $300 a month; he was the highest man in authority at Elgin; he certainly was possessed of all the information of and concerning the business; he obtained possession of this knowledge by reason of the relation he sustained to the appellant. Being

superintendent and manager, he was in a position of trust and confidence. As superintendent and manager, he necessarily was in possession of the fact that appellant had a lease on the Magnus property. He knew when the lease expired, he was acquainted with all the details connected therewith. Being so informed, he was charged with the duty of loyalty and fidelity, and as such prohibited, under the law, as already pointed out, from dealing in any manner with the subject-matter of the relation. In order to invoke this rule it was not necessary that Parker should have had authority to execute a lease for appellant. Under the decisions heretofore cited and quoted from, it is immaterial whether Parker had any discretion or authority relative to the making of leases, or the renewal of the same. It is insisted by appellees that even if the confidential relation does exist between a principal and an agent, and the agent obtains an interest in the property of the principal, adverse to the principal, it is only incumbent upon the agent to show that he acted fairly in the transaction and took no advantage of the principal.

On an examination of the cases cited in support of this contention, we are of the opinion they are not in point nor decisive of the case at bar. It is argued by appellees that under the theory of appellant, a man in the employ of another could not even entertain the idea of exchange of employment, or consider a change without committing a breach of confidence with his employer.

There is nothing to restrain an employee from changing his employment. There is a very great difference, however, between an employee changing his position and the conduct of an employee who avails himself of confidential information and procures for his own gain, interests and rights, in which his employer has a present and future interest, accomplishing his purpose without his employer's knowledge.

Appellees suggest that Parker warned the officers of appellant that certain parties were after the leasehold. It will be observed that this was before the entry of Mitchell into the situation. At no time did Parker advise his employers that Mitchell was angling for the lease. From the time that Mitchell developed an interest in the premises, Parker's lips remained sealed, and appellant was given no further warnings of operations by others to procure the lease. According to the testimony of Sherwood, a trustee, Parker and Mitchell were at the office of a trustee before the first of November in reference to the lease, and there is no suggstion in the record that Parker, when he was there with Mitchell, was there in behalf of appellant. It is further insisted by appellees that the rights of appellant ceased with the expiration of an alleged thirty-day option, and that equity aids the vigilant and not the indolent. It appears that on September 29, 1921, Kaine, the real estate man of appellant, began negotiations for a renewal of the lease, which did not expire until December 1, 1921. Kaine came away from the first interview with the impression that the trustees desired thirty days in which to find a purchaser for the property, if possible, as they preferred to sell. At the expiration of the thirty days on October 31, 1921, he arranged an appointment through Parker to continue the negotiations. The appointment Kaine requested was to be for two or three days later, and is the appointment that Parker went through the form of making. Before the date for the meeting arrived, the trustees called Kaine up and he learned for the first time that a new lease had been made to Parker and Mitchell. We are unable to see any laches in the conduct of Kaine. The suggestion that there was an option is not well founded. Parker did not claim that there was an option, and this is made quite clear by his conduct when Kaine called him up on October 31 and requested him to make an appointment

with the trustees. Parker did not make any suggestions about an option expiring. There was no option the law would recognize. The case of *Brach v. Matteson*, 298 Ill. 387, cited by appellees, is not in point because in that case an option was assumed and there was no question as to whether an option in the first instance existed. The case of *Brach v. Matteson, supra,* involved no fiduciary relation and has no bearing here. In reply to the suggestion that equity aids the vigilant and not the indolent, it appears that Parker was vigilant, but not that character of vigilance that is recognized in courts of equity. It is finally contended by appellees that appellant is not entitled to the relief sought because it maintained the Magnus leasehold as is assumed by appellees, for the purpose of stifling competition. It must be kept in mind that the question here to be determined is to whom does the lease belong? At no time did the trustees make any complaint with reference to the use of the property made by appellant; nor did they hesitate to offer appellant a new lease. This offer was not accompanied by any condition with reference to the future use of the property, the only difference between the parties throughout the negotiation being in reference to the amount of rent to be paid. The trustees made no complaint and Parker was in nowise affected. There is no evidence in the record that appellant exercised any restraint over trade in Elgin. It is not every restraint of trade that is unlawful. To be unlawful it must be unreasonable. To be unreasonable it must either be unlimited as to time or as to space.

It appears to be a rule of law in this State that a business organization may protect itself by reasonable restraints of trade. In *Andrews v. Kingsbury*, 212 Ill. 97, it was held that an agreement made as part of the consideration for a newspaper business, that vendor would not engage in that business in the same place in any capacity for himself or any one else, for a period

of five years, if the vendee remained in possession that long, is valid and the court said that a contract which is in only partial restraint of trade and is reasonable in its provisions is valid. The only transaction involved in this cause is the Magnus leasehold. How can it be successfully claimed that because appellant acquires a lease to this limited piece of territory or ground that thereby competition in the City of Elgin will be destroyed? It seems to be the universal rule that one coming into a court of equity must come with clean hands is confined to the conduct of the party in the matter before the court, not to matters *aliunde*. Courts will not refuse redress to the suitor because his conduct in other matters, not then before the court, may not be blameless. It is enough if the suitor shows that he acted justly, fairly and legally in the subject-matter of the suit. The injury must have been done, in regard to the defendant himself, and must have been done in regard to the subject-matter of the litigation. *Camors-McConnell Co. v. McConnell*, 140 Fed. 412.

Wrongful conduct in the very act or matter, which constitutes the complainant's ground of action, and that alone will repel from a court of equity on the ground that he who comes into equity must do so with clean hands. This rule does not disqualify any complainant from obtaining relief who has not dealt unjustly in the very transaction concerning which he complains. *Trice v. Comstock*, 121 Fed. 620.

There is much authority in Illinois sustaining the rule in *Andrews v. Kingsbury, supra,* and owing to the length of this opinion, by reason of the conclusion we have reached, we will not cite any further authority bearing upon this question of monopoly. Such contention, as we view the record in this case, cannot be successfully urged against appellant. We therefore conclude that whether or not Parker intended a wrong is immaterial. No matter how innocently, according

to his own standards of right and wrong, he may have proceeded, the rule of law is that bad faith is presumed where a trusted employee, directly or indirectly, takes unto himself an advantage at the expense of an employer, and whether he takes this advantage to himself alone, or whether it be taken for the benefit of himself and another, cannot change the rule.

As to the lessors, the record discloses that they knew that Parker was an employee of appellant; they had known it for a number of years, and this rule can be invoked relative to them; "that the laws in force at the time of the making of contracts, form a portion of their essence, and must be considered as entered into with reference to such laws and be so construed." *Reynolds v. Hall,* 2 Ill. (1 Scam.) 35-38.

We therefore hold that the chancellor erred in dismissing the bill of complaint of appellant, and the order and decree of the trial court will be and is reversed, and this cause remanded with instructions to enter a decree in accordance with the prayer of the bill in this cause.

*Reversed and remanded with directions.*