Messenger Publishing Company, Appellee, v. Aaron E. Mokstad, Trading as Mokstad & Company et al., Appellants.

Gen. No. 33,833.

Opinion filed April 28, 1930.  Rehearing denied May 12, 1929.

Zane, Morse & Norman and McElroy & Pearson, for appellants; Charles F. McElroy and Walter Wm. Pearson, of counsel.

Thompson, Tyrrell & Chambers and Gilbert, Rommel, Burger & Baker, for appellee; Joseph T. Tyrrell and Samuel H. Gilbert, of counsel.

Mr. Justice O'Connor delivered the opinion of the court.

On January 5, 1928, the complainant filed its bill against the defendants seeking to enjoin them from interfering with complainant in the conduct of its business, and on January 19 an order was entered enjoining each of the defendants, as prayed for in the bill. February 6 defendants moved to vacate the injunction. The motion, together with the cause when at issue, was referred to a master, who took the evidence, made up his report and recommended that the orders awarding the temporary injunction be vacated and the bill dismissed. The report was filed in court October 23, 1928. Exceptions were sustained to the report and a decree entered substantially as prayed for in the bill. The three defendants appeal.

The record discloses that complainant was engaged in business in Chicago publishing calendars, which are referred to in the record as sacred art calendars. There appear to have been four different kinds of calendars, designated thrift calendars, which were sold by complainant to banks, florist calendars, sacred art and church calendars, and historical calendars. Complainant carried on its business to a great extent by means of traveling salesmen and in each town but one concern engaged in a particular line of business would be sold calendars. The calendars showed the name and address of the business concern, which gave them to its customers and displayed some of them in

hotels, garages and other places, for advertising purposes.

Defendant Mokstad was engaged in a similar line of business and was a competitor of complainant. Before going into business for himself he was employed by complainant. Defendants King and Hodges were traveling salesmen employed by complainant for a number of years,—Hodges since 1903 and King since 1921. They both worked until about the last of the year 1927, when they left complainant's employ, or were discharged, and went to work for defendant Mokstad. Both King and Hodges had written contracts of employment with complainant for the calendar year 1927. They were to travel in Illinois, King having the southern 51 counties and Hodges the northern 49 counties. About September, 1927, they each entered into another contract of employment with the complainant for the calendar year 1928, King being assigned 39 counties in the southern part and Hodges 37 counties in the middle of the State.

The evidence shows that about October, 1927, defendant Mokstad began a systematic effort to secure all of complainant's traveling salesmen, including defendants King and Hodges. He knew that they were under contract with complainant for 1928. We think it unnecessary to go into the evidence showing Mokstad's methods in this respect. It is sufficient for us to say that the undisputed evidence shows that the methods he employed were wholly unwarranted. Hodges and King agreed to go with Mokstad for the year 1928 some time before December, 1927, but this fact was concealed from complainant, and during the latter part of 1927 although ostensibly working for complainant they were actually doing some work for Mokstad. The evidence further shows that complainant for a period of years had built up quite a trade and had prepared a list of its customers which it kept

under lock and key in steel filing cabinets under careful supervision at complainant's office. These lists were bound up and a copy of them was given to King and Hodges to enable them to do their work in selling calendars. They are not merely a list of names and addresses of complainant's customers but contain a great deal of other information. The counties, cities and villages are named, together with the population of each; the names of the customers who brought complainant's calendars during 1926, 1927 and 1928, the kind of calendar each customer bought, and other information.

When King and Hodges in the fall of 1927 agreed to go to work for Mokstad they turned over these lists to him, whereupon he made copies of them and began to circularize complainant's customers. The evidence further shows that complainant had spent large sums of money in advertising its business and compiling the lists; that once obtained, about 70 per cent of its customers renewed their orders from year to year.

The temporary injunction against King enjoined him from selling or offering for sale in the territory (39 counties in Illinois) mentioned in his contract with complainant any calendars except complainant's "until further order of this court but not beyond December 31, 1928." Hodges was enjoined from divulging confidential lists of customers or other trade secrets of the complainant company and from selling or offering for sale calendars to such of complainant's customers as had not purchased such calendars from anyone but the Messenger company during 1927; but the injunction was not to continue "beyond December 31, 1928." In discussing this matter counsel for defendants say, "Hodges is not restricted as much as King. He can work in the territory so long as he stays away from the persons on the list he furnished

to Mokstad, and even as to those he may solicit any others who were already known to Mokstad."

Mokstad is enjoined from persuading or inducing any salesmen under lawful contract with complainant to break his contract with complainant and from soliciting during the calendar year 1928 the sale of any calendars to complainant's customers of 1927 who had during that year bought such calendars only from the Messenger company. This injunction was limited to the territories covered by the King and Hodges contracts with the Messenger company. It was further limited to those persons whose names and addresses were secured by Mokstad from King and Hodges and who were theretofore unknown to Mokstad. The injunction was to continue "until the further order of this court but not beyond December 31, 1928."

The final decree was entered July 13, 1929. It sets forth the orders for the temporary injunction, makes certain findings, and orders and decrees that defendants' motions to dissolve the temporary injunctions be denied. The injunction against King is modified so as to restrain him only from conspiring and co-operating with Mokstad and from delivering to him complainant's lists of customers or copies thereof or other information, or from using the same, "but not beyond December 31, 1928." A permanent injunction is decreed against Mokstad enjoining him from directly or indirectly persuading or inducing any of the complainant's salesmen to break his contract of employment with the complainant. He is further permanently enjoined from using complainant's list which he had obtained from King and Hodges.

There is evidence in the record to the effect that complainant had wrongfully induced three salesmen employed by Mokstad to leave Mokstad and work for complainant in the sale of calendars, and that other of defendants' employees were wrongfully induced to

leave defendants and were employed by complainant. Other complaints are made against the complainant to the effect that it wrongfully solicited defendants' customers, etc. And in view of this evidence defendants contend that complainant's bill should have been dismissed because complainant did not come into equity with clean hands. We think we ought to say that the evidence of wrongdoing on the part of complainant is not of the same character as that complained of by complainant against defendants. We will not stop to discuss such question, for we do not think the contention of defendants is applicable here.

The rule that one who comes into equity must come with clean hands or he will not be entitled to any relief is limited to the misconduct of the complainant in regard to the matter in litigation. *Carpenters' Union v. Citizens Committee,* 333 Ill. 225; *Fagan v. Rootberg,* 320 Ill. 586; *Anisfield Co. v. Grossman & Co.,* 98 Ill. App. 180; *Cohn v. Pitzele,* 117 Ill. App. 342; same case affirmed 217 Ill. 30; *Consumers Co. v. Parker,* 227 Ill. App. 552.

In the *Carpenters' Union* case the court said (p. 250): "The rule that a complainant must come into equity with clean hands means that he must do equity as respects the defendant's rights in the particular matter of the suit. . . . The dirt upon his hands must be his bad conduct in the transaction complained of. If he is not guilty of inequitable conduct toward the defendant in that transaction his hands are as clean as the court can require."

The rule is similarly stated in the *Fagan* case, and in this connection the court discussed the cases of *Ely v. King-Richardson,* 265 Ill. 148, and *Langdon v. Templeton,* 66 Vt. 173. In referring to the *Ely* case the court said (p. 594): "The complainants filed their bills in chancery against the defendant company for an accounting for salary earned. . . . It was con-

tended by the company that the complainants did not come into court with clean hands, because, they said, they had, while in the employ of the company, begun the organization of a rival corporation in the same business for the purpose of carrying on business in competition with the defendant, and had induced a number of employees of the defendant to leave its employment and enter the employment of the new corporation." Continuing, the court quoted from the *Ely* case as follows: " 'Even if the conduct of the complainants was inconsistent with good faith to their employer and constituted a breach of their contract, they did not thereby forfeit the compensation which they had before earned. They might be liable for damages for the breaches of their contracts,—perhaps they might be enjoined from pursuing a course of conduct inconsistent with their contract obligations,—but they could not be deprived of their compensation already earned. . . . . The maxim that he who comes into equity must do equity cannot deprive the complainants of their right to an accounting which is not founded in any way upon their wrongful conduct.' " Continuing further the court quoted with approval from the Vermont case above mentioned, after referring to the maxim under consideration, the following: "it (the maxim) has its limits, and the administration of equitable relief in particular controversies is confined to misconduct in regard to the matter in litigation."

In the *Pitzele* case the court quoted with approval the rule as announced by the Supreme Court of Connecticut as follows: (217 Ill. 38) "We suppose it to be a well settled doctrine that if a plaintiff requires any aid from an illegal transaction to establish his demand, he cannot recover it, or, in other words, if he is unable to support it without relying upon an unlawful agreement between himself and the defendant he must fail."

In the instant case complainant relies for relief on the wrongdoing of the defendants. The claim of the defendants that complainant is guilty of wrongful conduct is not in regard to the matters alleged in complainant's bill. The doctrine of unclean hands does not apply. The only exception to the rule is where the complainant, in conducting its business, is perpetrating a fraud on the public. *American University v. Wood,* 294 Ill. 186, affirming 216 Ill. App. 189.

Defendants further contend that the contracts entered into between complainant and defendants King and Hodges lack mutuality, and that equity will not aid in enforcing such a contract and that the effect of the injunctions in this case is to enforce such a contract. We think this contention is unsound. But whether the contracts are enforceable is, we think, immaterial in this case. Defendants will not be permitted to wrongfully obtain complainant's lists, and endeavor to destroy complainant's business by saying that the contracts of employment lacked mutuality.

A further contention is that complainant's lists are not entitled to the protection of a court of equity; that they are not "trade secrets," and a number of authorities are cited, among them the case of *American Cleaners and Dyers v. Foreman,* 252 Ill. App. 122. In the instant case the lists were wrongfully obtained by Mokstad from King and Hodges. They were the valuable property of the complainant, it having compiled them at great expense. They were kept under lock and key at the complainant's place of business; they contained much information in addition to mere names and addresses of customers. Defendant Mokstad, in effect, obtained them fraudulently. Obviously equity will intervene to prevent their wrongful use.

In the *Foreman* case we held that where an employee of one had a route where he collected and delivered garments for cleaning and dyeing purposes, and

where the employee left the employer, he might solicit his old customers for his new employer. There were no lists stolen in that case nor any deception used. We there discussed the authorities and said (p. 126): "All of the authorities seem to agree that if the employee under such circumstances surreptitiously copies the names and addresses of his employer's customers while he is employed, and takes such lists with him, he will be enjoined from soliciting the customers for his new employer." We think the court was right in enjoining the use of the lists by the defendants. But defendants further contend, as we understand the argument, that no actionable wrong was done by the turning over of complainant's lists to Mokstad, because the contracts of employment between King and Hodges with the complainant provided that in case King or Hodges refused to return the lists, complainant might retain $25 from any commissions it might owe either of them as liquidated damages. We think the fact that the contracts so provided did not warrant defendants in surreptitiously turning over the lists to the defendant Mokstad. The lists were valuable assets belonging to complainant, and we think it obvious that it was not the intention of complainant that King and Hodges could keep the lists merely by complainant taking $25 from their commissions. Moreover, there is no contention that the complainant retained $25 commission.

Considerable is said in the brief filed by defendants as to the temporary and final injunctions against King; but we are not interested in that question now because since the case was brought to this court a written, verified stipulation has been filed in this court in which King stipulates with complainant that the appeal may be dismissed and that he releases and waives all errors, if any. This stipulation is properly before us. *Wick v. Chicago Tel. Co.*, 277 Ill. 338; *Laskey v. Laskey*, 226 Ill. App. 566. The fact that the complain-

ant's motion to dismiss the appeal as to King, in accordance with the stipulation, was denied by us on the ground that the appeal was joint, does not affect our right to consider that King, so far as he individually is concerned, is not here complaining.

We think the defendants were properly enjoined and the decree of the superior court of Cook county is affirmed.

*Affirmed.*

McSURELY, P. J., and MATCHETT, J., concur.